**In the Matter of A.B.E.**

**Appeal of M.A.E.**

**No. 86–984.**

District of Columbia Court of Appeals.

Argued Nov. 22, 1988.

Decided Sept. 29, 1989.

**752**

Nancy L. Cook, Washington, D.C., for appellant. Ann Shalleck was on the brief for appellant.

Joel R. Curtis, Washington, D.C., for appellee A.B.E.

Charlotte M. Brookins, Asst. Corp. Counsel, Frederick D. Cooke, Jr., Corp. Counsel at the time the statement was filed, and Charles L. Reischel, Deputy Corporation Counsel, Washington, D.C., filed a statement in lieu of brief, for appellee District of Columbia.

Before MACK, TERRY and STEADMAN, Associate Judges.

MACK, Associate Judge:

This is an appeal from an order terminating parental rights under D.C.Code § 16–2353 (1981).[1] Appellee A.B.E., a twelve-year-old learning-disabled boy, was the victim of child abuse. His natural father, appellant M.A.E., argues that the termination of his parental relationship with his son would not fulfill the basic purposes of the parental rights termination statute, *viz.*, encouraging stability in the life of this neglected child, securing the constitutional rights of all parties involved, and increasing the opportunities for prompt adoptive placement. D.C.Code § 16–2351(a). In support of this contention, appellant asserts that the Department of Human Services (DHS) failed to meet its initial duty to try to strengthen the relationship between the natural father and his son, and further, that the child's future adoption is unlikely. Appellant also argues that the trial court's order terminating his parental rights was unsupported by clear and convincing evidence, since no professional evidence was presented regarding his mental health, and since, as he contends, there was insufficient evidence regarding his future ability to raise the child. Finally, appellant raises a constitutional challenge to D.C.Code

---

1. D.C.Code § 16–2353 (1981) reads as follows:
　　(a) A judge may enter an order for the termination of the parent and child relationship when the judge finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child.
　　(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
　　(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
　　(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
　　(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent; and
　　(4) to the extent feasible, the child's opinion of his or her own best interests in the matter.

§ 16–2353 (1981) as violative of his due process rights and void for vagueness. We find that the termination of the relationship between the father and the child was not in the child's best interests, but that the passage of three years since the termination proceeding may have altered conditions substantially, and accordingly, we vacate and remand. We find it unnecessary to reach the other issues on appeal.

I

The child, A.B.E., was born on December 26, 1976. Shortly after the child's birth, his mother abandoned him. A.B.E. continued to live with his father and a stepmother until February 19, 1982, when he was removed from the home as the result of allegations of abuse by the father. Subsequently, at the suggestion of his father, A.B.E. was placed in the foster care of his maternal aunt, allowing liberal visitation with his stepmother and supervised visits with his father.

On May 11, 1982, the natural father and stepmother entered into a stipulation of neglect. They admitted that on February 17, 1982, the natural father had beaten A.B.E., injuring his face, arm, and thigh, and that on prior occasions, he had also "employed excessive physical discipline" on his son. M.A.E. once struck the child with a stick for spilling milk on the kitchen floor. Another time, his striking A.B.E. caused a nosebleed. A witness at the termination hearing testified that on a third occasion, when the child was three years old and had accidentally urinated on a friend's carpet, appellant struck him with a chrome table leg, fracturing his hand. Witnesses also recounted an incident, when A.B.E. was five, in which appellant became enraged by his son's persistent mistakes in identifying letters of the alphabet and physically abused him. One witness testified that on this occasion, when she opened a bedroom door, she saw the child fly across the room and hit a wall.

There was also evidence of more appropriate behavior on the father's part. Testimony at trial indicates that M.A.E. often played with A.B.E., taking him to the park, and teaching him how to swim. The father and son shared some quiet, pleasant moments when the child would sit in his father's lap and the two would converse happily. When, at age three, A.B.E. was sexually abused by an older boy in the neighborhood, M.A.E. contacted the police, and confronted the abuser's father with the incident.

On July 29, 1982, at his father's suggestion, the child was removed from the custody of his aunt and placed in the foster care of a Muslim congregation, where he lived in a mosque. While at the mosque, he was beaten with a belt buckle and injured when an adult walked across his back. He was therefore returned to his aunt's custody on June 16, 1983. Nevertheless, A.B.E. was again removed from his aunt's care under DHS auspices on September 13, 1983, and placed in a foster home, where he remained until October 1984. Due to difficulties that had developed in his interaction with the other children in this foster home, A.B.E. was then placed in another foster home, where he was still residing at the time of the termination hearing. Nevertheless, this foster family indicated that it did not wish to adopt A.B.E.

On November 19, 1985, A.B.E.'s guardian *ad litem* filed a motion to terminate the rights of both natural parents. Personal service could not be effected on the child's mother, but a hearing on the termination of the father's rights was commenced on May 20, 1986, and concluded a week later. The witnesses at this hearing were two psychologists, a social worker assigned to A.B.E. and his foster family, a social worker assigned to A.B.E.'s natural family, a DHS adoption coordinator, a former wife of M.A.E.'s, and M.A.E.'s cousin, who had lived with appellant and his child. Family members testified to the particular incidents in the relationship between M.A.E. and A.B.E. detailed above; the psychologists and social workers testified as to their expert observations.

Clinical psychologist Raymond Crowel, who saw A.B.E. approximately weekly between 1984 and 1986 and conducted family therapy sessions with the child and his

foster family, testified that the boy suffered from an overanxious disorder marked by confused feelings towards his natural father. Dr. Crowel had recommended the discontinuation of contact between A.B.E. and M.A.E. due to his perception that the child became overanxious after telephone calls with his father. Similarly, Dr. Ronald Wynne concluded that A.B.E. was an angry and insecure child, and, based on his contact with A.B.E. and his evaluation of various tests, he determined that the boy saw adult males as threatening figures. Dr. Wynne concluded that these feelings resulted from A.B.E.'s interaction with his father. He also found that A.B.E. was mildly retarded, with developmental delays in his cognitive and language skills.

Social worker Tanya Jones was assigned to A.B.E.'s natural family in April 1984. Pursuant to court order, she supervised weekly telephone calls between A.B.E. and his natural family. Although such calls ordinarily last ten minutes, Jones testified that she terminated most of these calls after two or three minutes because of her perception that they were upsetting the child. On June 6, 1984, the calls were terminated by court order. Jones also testified that although her contacts with M.A.E. were minimal, she found that he was upset and frustrated with her because he felt that he was not receiving the services he expected. Perhaps as a result, he proved uncooperative with Jones in her efforts to assist him and the child.

Social worker Julia Mayfield began visiting A.B.E. in his foster home twice a month beginning in November 1984, after contact with his father had ceased. During this time she was in contact with both Dr. Crowel and Dr. Wynne. She testified that A.B.E. had been attending a special school for emotionally disturbed children, and had made significant progress in learning how to interact positively with adults and children.

Pursuant to the stipulation of neglect, M.A.E. was required to undergo a program of therapy under DHS auspices before the resumption of visits with his son. Administrative difficulties and misunderstandings prevented him from registering for treatment at Howard University and St. Elizabeths Hospital. Nevertheless, M.A.E. eventually entered therapy at the District of Columbia Institute of Mental Hygiene, at his own expense, attending weekly sessions for more than a year. His therapist stated that continued therapy would result in "healthier socio-emotional adjustment," and it is reported that he made steady progress during the time he was in treatment. M.A.E. quit attending these sessions, however, before the fruition of his treatment.

The trial court terminated M.A.E.'s parental rights on June 3, 1986. The court reviewed the factors for the termination of a parent-child relationship as set forth in D.C.Code § 16–2353(b), *supra* note 1, and made determinations with respect to each of them. The court concluded that although A.B.E. would face much uncertainty if M.A.E.'s parental rights were terminated, the termination would at least increase A.B.E.'s chances of adoption, and was superior to the resumption of a violent relationship with his father. The court therefore concluded that, by clear and convincing evidence, it would be in the child's best interests to terminate the father's parental rights.

## II

Although we do not decide this case on the basis of the constitutional claims advanced by appellant, we find it useful to recite the legal and constitutional interests of the several parties to this appeal. The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling. D.C.Code § 16–2353(a) (1981); *In re C.O.W.*, 519 A.2d 711, 713–14 (D.C. 1987); *In re Adoption of J.S.R.*, 374 A.2d 860, 864 (D.C.1977).[2] While the rights of

---

**2.** In *C.O.W.*, we held that, in the termination context, "[a]ll persons involved with the child are to be considered in relation to the best interests of the child." 519 A.2d at 713–14. In *J.S.R.*, we deemed "the right of a parent to raise one's child [as] an essential, but not absolute one, which can be terminated when the best interest of the child so requires." 374 A.2d at

the natural parents to bring up their children are subject to the protection of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, *Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972); *see also Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (Due Process Clause requires "fundamental fairness"); *Lassiter v. Department of Social Services,* 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981) (Due Process Clause does not entitle natural parent to legal assistance), these rights are not absolute, and must give way before the child's best interests. *In re Adoption of J.S.R., supra,* 374 A.2d at 864. Moreover, the natural parents' constitutional rights are relevant only to the question of what process is due in a termination proceeding, and such a proceeding requires no balancing of the parents' interests against those of the child. *In re M.M.M.,* 485 A.2d 180, 184 (D.C.1984). Finally, the burden is on the moving party to show that the termination of paternal rights would be in the best interests of the child. *See In re K.A.,* 484 A.2d 992, 995–96 (D.C.1984); *cf. In re B.K.,* 429 A.2d 1331, 1333 (D.C.1981) (in adoption proceeding government has burden to prove its case by a preponderance of the evidence).

■ The criteria for determining the child's best interests are set forth in D.C. Code § 16–2353(b), *supra* note 1. The trial court is charged with considering four factors: the child's need for continuity and stability of care and caretakers; the physical, mental and emotional health of the child and of all individuals involved to the extent that it affects the child's welfare; the quality of the child's interaction with natural relatives and foster parents; and the child's own opinion of his or her best interests in the matter. *Id.* To affirm the termination of parental rights, this court

must be satisfied "that the possibility of an erroneous judgment does not lie in equipoise between the two sides"; that is, that the likelihood of an erroneous decision would be greater if the trial court elected not to terminate parental rights. *In re K.A., supra,* 484 A.2d at 996.

Applying this standard of review, we conclude that the trial court's evaluation of these factors did not support its conclusion, by clear and convincing evidence, that termination was in A.B.E.'s best interests. The court's findings with respect to each of the four criteria, while they tell an unhappy story, do not make out a case that termination would be the best alternative available for this child. While termination might marginally improve A.B.E.'s chances of finding stable adoptive placement, we cannot say that the potential psychological costs of such termination will not outweigh the benefit of this opportunity, which remains highly speculative, nor that the possibility of error would be greater in refraining from terminating parental rights than in terminating them.

■ The trial court found, first, that while A.B.E.'s interaction with his father, D.C.Code § 16–2353(b)(3), had at times been fruitful and that appellant genuinely loved his son, their relationship was "pervaded by violence perpetrated by the father on the son," and that this violence, together with "the son's perception of his father as equated with violence, [overrode] the fruitful aspects of the relationship." The trial court also stated that while the foster parents were providing a "stable and loving" environment for the child, there was insufficient evidence to determine the quality of the child's relationship with them. Second, in evaluating the physical, mental and emotional health of A.B.E. and M.A.E., D.C.Code § 16–2353(b)(2), the court observed that M.A.E. was unable to react appropriately to what he perceived as chal-

864. *Cf. In re D.I.S.,* 494 A.2d 1316, 1322 (D.C. 1985) (best interests of child determinative to adoption); *In re N.M.S.,* 347 A.2d 924, 927 (D.C. 1975) (upholding determination based on best interests of child in custody action between natural mother and foster parents); *Coles v. Coles,* 204 A.2d 330, 331 (D.C.1964) (in custody action

between natural parents, "[a]bove all things, the paramount consideration is, what will promote the welfare of the child?" (quoting *Chapsky v. Wood,* 26 Kan. 650 (1881))); *In re Lem,* 164 A.2d 345, 348 (D.C.1960) (trial court "had the duty to view all the evidence with the best interests of the child as its guide" in neglect proceeding).

lenges to his authority, often reacting with violence in such situations. The court concluded that despite his sincere desire to change his behavior, M.A.E. had not developed sufficient insight into his problem to be able to control himself. As for A.B.E., the court found that he was learning disabled, perhaps from birth, and that he had serious emotional difficulties resulting in large part from his father's violence toward him. Third, in considering the need for continuity and stability in A.B.E.'s life, D.C.Code § 16–2353(b)(1), the court concluded that such needs were clearly present, but because the child's foster parents did not wish to adopt him, none of the immediate alternatives was likely to satisfy those needs. The court noted that there was no strong bond between the child and his natural father, partly because, under a court order, they had had no contact for a period of two years.[3] Finally, assessing A.B.E.'s own preferences, D.C.Code § 16–2353(b)(4), the court found that he sometimes wished to return to his father, but only if his father would no longer beat him—a hope the court deemed "unrealistic."

■ In evaluating the trial court's conclusions, we return to the three purposes for which the statute providing for the termination of parental rights was enacted:

(1) to encourage stability in the life of the neglected child; (2) to ensure the recognition and enforcement of the constitutional rights of all parties; and (3) to increase the opportunities for prompt adoptive placement. D.C.Code § 16–2351(a).[4] Since the trial court found that none of the available alternatives offered any promise of stability in the life of this child, this inquiry offers no answer for the purpose of determining whether the termination of parental rights is warranted. Similarly, to the extent that we think the trial proceeding complied with principles of due process and afforded recognition to the constitutional rights of the parties, our consideration of the case in light of this statutory purpose affords no substantive answer. (Moreover, even a procedural shortcoming would only warrant remand for a properly-conducted proceeding; procedural issues do not yield substantive answers regarding the preferability of continuation or termination of a parent and child relationship.) Finally, as the trial court recognized,[5] any expectation that termination would increase this child's opportunities for adoptive placement must be marginal. Regardless of his legal status, a developmentally retarded minority adolescent such as A.B.E. is extremely difficult to place in an adoptive home.[6] We

---

3. Appellant contends that this separation resulted in part from court orders, and in part from the *dilatory actions of administrative agencies.* Thus, he argues, he should not be blamed for, or suffer from, the legal conclusions drawn from this separation. The issue, however, is not one of attaching blame or punishing the natural parent, but of protecting the best interests of the child. *See In re Cager,* 251 Md. 473, 480, 248 A.2d 384, 389 (1968) (child not to be used as pawn in punishing immorality of parent); Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards,* 27 Stan.L.Rev. 985, 1002–04 (1975). It was only in the context of that inquiry that the trial court correctly considered the effects of the separation.

4. In returning the statutory purposes, we do not mean to supersede the criteria listed in D.C. Code § 16–2353(b), and relied upon by the trial court. The trial court quite properly relied upon these factors. Rather, taking the trial court's findings with respect to each of these factors as correct, we seek to illuminate the guidance they offer by resituating them in the

context of purposes for which their review by the trial court is required.

5. The trial judge said:
    [T]he prospects for adoption, given his age, history and emotional problems, are not good....

6. The improbability of adoption for a child with A.B.E.'s characteristics is aptly illustrated by resort to statistics:
    A 1973 [National Center for Social Statistics] report indicated that 38 percent of the children adopted in 1971 were less than one month of age at the time of placement, and that an additional 46 percent were 11 months of age or younger.... Nearly 95 percent of all adoptions in those states reporting for 1975 involved children without any physical or emotional handicap.... In 1974 only 25,-000 nonwhite children were adopted although 249,600 nonwhite children presumably were available as a result of 1974 illegitimate births alone.
    Note, *Racial Matching and the Adoption Dilemma: Alternatives for the Hard to Place,* 17

cannot consider the increase in this child's opportunity for adoptive placement, under the circumstances of termination, more than a minimal elevation of a low chance, and thus, standing alone, an unrealistic basis for such a momentous change in this child's status. Of course, the situation would be quite different if a prospective placement were proposed. Furthermore, regardless of the natural mother's failure to take an interest in A.B.E., absent the termination of her paternal rights, we cannot say that the termination of the father's rights would result in any appreciable increase in A.B.E.'s opportunities for adoptive placement.

█ In the absence of any substantial good to be achieved for this child by the termination of his relationship with his natural parents, the affirmative step of terminating that relationship is unsupported. The trial court's findings show a child without a permanent home and without a reasonable opportunity of finding one. He is now almost a teenager. From earliest childhood, he has suffered violence at the hands of an emotionally disturbed father, and has been deprived of the continuing care and protection of a mother. He has also seen violence while in the custody of others, and has never remained in the same home for more than a few years at a time. While under the charge of public instrumentalities, however, he has for at least some of the time remained in contact with his natural father, and has expressed an interest in returning to him, though admittedly, under the unlikely condition that his father refrain from abusive behavior toward him. The father, too, has expressed and acted upon a desire to reunite with his son, and has made efforts to obtain therapeutic treatment for his emotional disturbance. Encountering difficulty in obtaining therapy, he pursued the matter at his own initiative, obtained therapy at his own expense, and showed some progress while he remained in treatment.

We are not deluded that this progress will translate into the reunification of the natural father and son. We credit the trial court's skepticism toward the possibility that appellant will change his behavior enough to make a traditional father and son relationship possible between M.A.E. and A.B.E. Nevertheless, we see nothing to be gained by terminating this relationship. In balancing the minimal possibilities of adoptive placement against the stabilizing influence, and the sense of identity, that some continuing legal relationship with natural relatives may ultimately bring, we must conclude that termination would only cast A.B.E. further adrift. The instrumentalities of the state have effectively prevented M.A.E. from doing harm to this child since taking A.B.E. into their care, and they have it in their power, without terminating parental rights, to restrict access as far as necessary—even to the point of total exclusion—to protect the physical, mental, and emotional needs of the child. It appearing that this parent and child relationship appears to retain some value to both A.B.E. and M.A.E., we conclude that the utter termination of the relationship cannot be sustained where these safeguards exist.

### III

█ This is a melancholy and exceedingly delicate case, and we do not reach to-

J.Fam.L. 333, 334 n. 9 (1978–79) (citations omitted).

"Only 1% or less of the white families willing to adopt Black children request children who are most in need of families: children over eight (8) years of age; sibling groups and emotionally and physically handicapped children." Like most of their Black counterparts, most whites waiting to adopt want infants, although they will accept toddlers. Across the country, there are waiting lists of Black families who want to adopt pre-school children. To be sure, that potential white adoptive parents want pre-school children is indicated by the difficulty and inability adoption agencies have in placing white children who are older or handicapped.

Bowen, *Cultural Convergences and Divergences: The Nexus Between Putative Afro–American Family Values and the Best Interests of the Child*, 26 J.Fam.L. 487, 506 (1987–88) (citations omitted).

These statistics are admittedly not localized in time or place. Nevertheless, they provide a picture of the odds A.B.E. would have to overcome with respect to *each* of the characteristics presenting hurdles to his adoption, not to mention their collective impact.

day's judgment without searching reflection. Three years have now passed since A.B.E.'s termination hearing, an enormous span in the lifetime of a child. In that time, A.B.E. has grown from childhood to adolescence. Our record does not reflect the intervening changes in his family situation, mental and emotional needs, or attitudes toward his own family status and future. In vacating this case and remanding it to the trial court, we therefore instruct the trial court to explore these developments and, upon consideration of any relevant changes in the status of this child or other interested parties, to apply the law in a manner consistent with this opinion.

*So ordered.*