E.C., Appellant,

v.

**DISTRICT OF COLUMBIA, Appellee.**

**In the Matter of C.C., J.C., and R.C.**

**Nos. 90–1218, 90–1241 and 90–1242.**

District of Columbia Court of Appeals.

Argued April 1, 1991.
Decided April 12, 1991.

John J. Connelly, Washington, D.C., appointed by this court, for appellant E.C.

Charles L. Reischel, Deputy Corp. Counsel, and John Payton, Washington, D.C., Acting Corp. Counsel, filed a statement in lieu of brief for appellee District of Columbia.

Marion E. Baurley, Washington, D.C., appointed by this court, for appellees C.C., J.C. and R.C.

Before ROGERS, Chief Judge, STEADMAN, Associate Judge, and MACK, Senior Judge.

ROGERS, Chief Judge:

In this expedited appeal, appellant E.C., the natural father of three young boys, appeals from an order terminating his parental rights on the ground that the judge's findings were not supported by clear and convincing evidence.[1] Specifically, he claims that the trial judge relied on outdated, minimally relevant information regarding E.C.'s emotional condition and current parenting abilities, erred in finding that the children were very adoptable, and abused his discretion in considering a stepdaughter's testimony about alleged sexual molestation and the attempt to defraud her of insurance money. Upon review of the record, we find no error or abuse of discretion by the trial judge, whose findings and conclusions appropriately address all statutory requirements, and accordingly we affirm.

I

This case involves three children who were first brought to the attention of the District of Columbia Department of Human Services in 1983. After assisting the parents, the Department eventually placed the children in shelter care in 1986.[2] The parents entered into a stipulation of neglect in June 1987.[3] In the next year and a half, the children were placed in five foster homes while the Department continued efforts to reunite the family.[4] When the natural parents failed to follow through on recommended parenting classes, marital counseling and therapy, these efforts ended, and counsel for the children filed a motion to terminate parental rights on October 16, 1989, noting that an adoptive home had been found for the children. Neither parent personally appeared during the five days on which the trial judge heard testimony on the motion, although both were personally served with a summons and complaint notifying them of the termination hearing and counsel appeared for them at the hearing. The judge granted the motion to terminate and issued written findings and conclusions on September 10, 1990. We summarize the evidence relevant to the issues raised on appeal.

Two expert witnesses offered testimony about E.C.'s mental condition and its effect on the children. Dr. Michael Spevak, a psychiatrist who had evaluated E.C. in 1987

1. The children were born in 1983, 1984 and 1985. Only the father appealed from the order of termination of parental rights. The mother filed a statement in lieu of brief that she "concurs with the position taken by E.C." in his brief.

2. The complaint alleged that the children were placed in protective custody on September 5, 1986, when neighbors reported seeing E.C. hit the eldest child, who was only three years old, so hard that the blow lifted him off the floor, and Department records indicated a pattern of conduct endangering the children. The month before, an attorney had heard crying and screaming outside his office window, and had found the children on a relatively warm summer afternoon, August 29, 1986, in a car in the Department of Human Services' parking lot. He contacted the Department, but E.C. removed the children before Department officials arrived.

3. The stipulation of June 4, 1987, included the statement that E.C.'s emotional problems at times interfered with his ability to provide appropriate care for his children. It also committed the parents to participate in parenting classes, individual therapy for E.C., and marital counseling, and to cooperate with the social worker and follow through on referrals made by her. The stipulation also stated that E.C. and his wife, D.C., were separated and living apart, and unable to provide for the care and custody of their children. The children were then ages 3, 2, and 1.

4. Despite efforts by the Department to keep the children together, they were not always placed in the same foster home although the two younger children were usually placed together.

at the request of the court in connection with the neglect petition, testified that E.C. suffered from a character disorder which caused him to view everyone around him with deep suspicion and to deny any personal responsibility for events in his life, and hindered his ability to have any insight into his problems. Dr. Spevak explained the various ways in which a parent who suffers from such a character disorder could cause severe emotional damage in his or her children. The emotional problems that he observed in E.C. were, in Dr. Spevak's opinion, virtually intractable; even prolonged therapy would be unlikely to have more than a "minimal" effect in improving E.C.'s abilities as a parent.[5]

Psychologist Rachel M. Petty, an expert in child psychology and the evaluation of parent-child relationships, testified about the damaging effect the parents' behavior had on the children. Dr. Petty evaluated the two younger boys following their removal from the home and observed the parents during their visits with the children. Dr. Petty found the children "significantly" developmentally impaired in a number of ways, exhibiting deficiencies in verbal and interpersonal skills. The parents, in turn, appeared "overwhelmed" by the children during the visits; they were unable to relate to their children in an appropriate manner, appearing, for example, unable to pay attention to each of the three children in turn, instead lavishing attention on whichever child "screamed the most" during a particular visit, while ignoring the other two, and allowing the children to gorge on food until they vomited. After the visits, the children appeared very upset, and Dr. Petty was of the opinion that the two younger children did not appear to have bonded with their parents. The im-

pact of the youngest child's failure to bond was so severe that, although only fifteen months old, he would not allow people to hold him and did not respond to his name.

Four foster mothers with whom the children were subsequently placed testified that the placements, which otherwise worked well, were marred by the conduct of the natural parents, causing two foster mothers to insist that the children be removed from their homes, while another made such a request but later withdrew it. The foster parents testified that the parents made harassing telephone calls, as many as ten in one night to one foster parent, in which they threatened foster parents with physical harm and promised to kidnap the children when they were unattended.[6] The telephone calls also had a negative effect on the children, the foster mothers reporting that the children became very upset when they were allowed to speak to their parents on the telephone. In addition, the foster mothers advised that visits with their parents had a very negative effect on the children: the eldest would behave uncontrollably for days after a visit, the middle child would wet the bed, and the youngest would inflict deep scratches on his arms. The foster mothers also confirmed testimony regarding the sporadic nature of the parents' visits with the children, noting that they frequently brought the children to the Department for parental visits only to discover that the parents had failed to appear.

Ms. Wisdom, the supervisory social worker in the Child and Family Service Division of the Department, who had been the caseworker for the children from October 1987 to April 1989, reviewed the history of Department plans and efforts to reunite the family, the natural parents' failures to fol-

5. Marsha Munson, a counseling psychologist with the Department of Veterans' Affairs who was assigned to assist E.C. in completing a program of on-the-job training, offered further evidence of E.C.'s inability to organize his life and meet his obligations, including attending training on a regular basis and meeting with his children. Although E.C. expressed a strong desire to excel, and performed assigned tasks successfully, Ms. Munson described the disparity between his words and actions in that he was suspended from the program in 1989 due to

excessive absences after only two months of participation. She estimated that there was only a twenty-five percent likelihood that E.C. would successfully complete any job training program.

6. As a result, two of the foster mothers imposed severe restrictions on the children, refusing to allow them to play outside for fear that E.C. would carry out his threats to kidnap them.

low through on these efforts, and their sporadic efforts to visit their children.[7] The visits that occurred with the children had to be closely supervised due to E.C.'s unpredictable behavior.[8] Ms. Wisdom noted that the placement of the children in five foster homes was "very unusual," but necessary as a result of the natural parents' aggressive and hostile behavior towards the foster parents.

With regard to the children's relationship to their natural parents, Ms. Wisdom testified that the children looked to the foster parents for day to day care as their parents. The two youngest children had not stated any wishes with regard to their parents, and the oldest child cried when his parents failed to show up for visits. Based on their ages and capabilities and the absence of any significant health problem, Ms. Wisdom thought that they were adoptable, recounting that one family had been interested in adopting the children and that subsequently two other interested families had been cleared by the Department.[9]

Finally, over objection, a daughter of D.C. and stepdaughter of E.C. testified that when she was thirteen years old, E.C. had sexually molested her, and on one occasion, he had slammed her against a wall so hard that her head left a hole in the wall, then twisted her arm behind her and flipped her over the bed, trying to break her arm. She also testified that E.C. behaved violently toward her mother. Her testimony was corroborated in large part by testimony of her foster mother, who also testified regarding E.C.'s threats to her own physical safety as well as his threats to kidnap his stepdaughter, all of which caused her to seek a civil protection order from the court. The stepdaughter testified in addition that her mother had taken the proceeds of a life insurance policy left to her by her grandmother.

The trial judge credited the foster mothers' testimony regarding harassment by the children's parents, and found that it had resulted in multiple placements for the children when the foster parents, unable to tolerate the continual telephone calls and verbal threats, had requested that the children be removed from their homes. The judge also credited the stepdaughter's testimony, observing that the insurance incident demonstrated the failure of the parents to use the money they obtained to benefit their children. The judge further found that the parents had refused to cooperate in counseling as a step toward reunification with their children, and was persuaded by Dr. Spevak's testimony that E.C.'s lack of insight and unwillingness to take responsibility for his actions toward his children posed significant risks to them. The judge concluded that E.C. had made almost no progress as a potential parent in the four years during which his children were in protective custody, and further that, based on evidence regarding the parents' turbulent relationship, D.C. was un-

---

7. Although there was evidence that the natural parents were motivated by the desire to see their children, in fact their visiting habits were sporadic. When the parents were separated on two occasions they did not visit the children at all. At other times they did not visit the children for long periods of time. While there was evidence that E.C. had a fight with a guard at the Department offices, Ms. Wisdom testified that even when she informed E.C. that other arrangements would be made when he came to the Department offices, the parents refused to visit the children between March 1988 and March 1989. While they apparently telephoned the children during this period, they never followed through, according to Ms. Wisdom, on efforts to visit the children.

8. Ms. McMullen, also from the Department, who supervised visits of the natural parents with the children and spoke with the parents on

several occasions, corroborated Ms. Wisdom's testimony about the natural parents' failure to take advantage of services offered to them, and in particular described E.C.'s refusal to follow through on therapy and counseling, although he did seek counseling sporadically. She recounted an incident in which she was threatened by them, and described E.C. as "hostile" and uncooperative.

9. Ms. Wisdom testified that the first family had withdrawn their interest because of fear of harassment by the natural parents and the delay in the termination proceedings; they had subsequently adopted two other children. The other two families identified by the Department had already undergone home studies, police clearances, child abuse and neglect clearances, reference checks, and participated in a Department program on parenting skills.

able to live independently of E.C. and take sole responsibility for the care of their children.[10]

In regard to the children, the trial judge credited the testimony of Dr. Petty in finding that they had formed "no significant bond[s]" with their natural parents at the time they were removed from the home, and credited the testimony of the foster parents and the social worker that the children were developing well. Further, the judge found that the children were "very adoptable," noting that two families had expressed interest in adopting all three siblings, while another family that initially expressed interest in the adoption had been driven off by reports of E.C.'s pattern of harassment. The judge therefore concluded that the best interests of the children required the termination of the natural parents' rights to the children in order to facilitate prompt placement of the children in a permanent home.

## II

"The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling." *In re A.B.E.*, 564 A.2d 751, 754 (D.C.1989); *see also Appeal of H.R.*, 581 A.2d 1141, 1173–74 (D.C.1990). In the District of Columbia, the trial judge is required by statute to examine various factors in assessing the child's best interests:

> (1) the need for continuous and stable care, caretakers and home environment; (2) the health of all persons involved with the child, and the child's health; (3) the quality of the interaction and relations between the child and those involved with her; (4) the child's opinion, if feasible to solicit it.

D.C.Code § 16–2353(b) (1989). These factors are to be examined with reference to the general statutory purposes to encourage stability in children's lives, to ensure recognition of all parties' constitutional rights and "to increase the opportunities for the prompt adoptive placement of children for whom parental rights have been terminated." D.C.Code § 16–2351 (1989). *See In re A.B.E., supra*, 564 A.2d at 756.

The trial judge made extended findings on three of the statutory factors, finding that the children appeared to be developing relatively well in their foster homes, notwithstanding their natural parents' harassing behavior towards the foster parents which had been detrimental to the children, and that a permanent placement, obtained as soon as possible, would be in the children's best interests. In assessing the health of the children and the adults involved with them, the judge credited uncontroverted psychiatric testimony that E.C.'s personality disorder would not improve, and that his condition could have negative effects on the children. The judge further found that none of the children had formed a "significant" bond with their parents, and concluded that "[t]hese children's need for continuity of care and caretakers and for timely integration into a stable and permanent home cries out for prompt action in this case." As to the fourth factor, the child's opinion of his best interests, the judge determined that the children's tender ages made such an inquiry infeasible. E.C. poses three challenges to the judge's findings in contending that they are unsupported by clear and convincing evidence.

### A.

*E.C.'s emotional condition.* E.C. attacks the expert testimony regarding E.C.'s emotional condition on three grounds: (1) staleness, since Dr. Spevak's testimony regarding E.C.'s current parenting abilities stemmed from a 50 minute examination

---

10. The evidence before the trial judge included that E.C. and D.C. had separated on numerous occasions and that when they were together, D.C. allowed herself to be entirely dominated by E.C. Thus, the Veterans Administration psychologist testified that D.C. always accompanied E.C. to his job counseling sessions, which the psychologist noted was unusual. One of the foster mothers testified that when D.C. made harassing telephone calls to her home, she could hear E.C. in the background, telling D.C. what to say. There was other evidence that D.C. joined E.C. in harassing foster parents on several occasions, and appeared to mimic E.C.'s hostile behavior.

that occurred in 1987, while Dr. Petty's testimony was based on observations in 1987 of two of the children shortly after they were removed from the home; (2) relevance, since mental illness itself is not an appropriate ground for termination of parental rights; and (3) inconclusiveness, since Dr. Spevak failed to diagnose E.C. as suffering from a specific, named mental illness. None of these grounds has merit.

■ First, although Dr. Spevak examined E.C. several years ago, he testified that E.C.'s illness was of a chronic nature, unlikely to change over time even with intensive therapy. *See In re M.M.M.*, 485 A.2d 180, 185 (D.C.1984) (psychiatric testimony based on examination three years earlier competent to establish that mother suffered from chronic mental illness). In addition, the testimony of the foster mothers, the Veterans Department psychologist, and the social worker, whose associations with E.C. were more recent, indicated that he continued to experience the same type of mental problem which he had exhibited to Dr. Spevak. Similarly, Dr. Petty's examination of the children, offered to show the detrimental effects of the parents' behavior on the children when the parents last had custody, was corroborated by the foster mothers' and the social worker's more recent associations with the children which revealed that the children found their parents' visits upsetting and demonstrated no apparent bonding with either parent. Thus, E.C.'s contention that the expert testimony was incompetent and unreliable is meritless.[11]

■ Second, while mental illness is not itself an adequate ground for termination of parental rights, the trial judge could properly consider the effect of E.C.'s men-

tal condition on the welfare of the children. *In the Matter of K.J.L.*, 434 A.2d 1004, 1006–07 (D.C.1981). The trial judge did not rely solely on E.C.'s mental condition as the basis for terminating his parental rights. Rather, the judge appropriately viewed E.C.'s mental condition as significant because of its potential adverse effect on his children, as indicated by the medical experts' testimony and his stepdaughter's testimony.[12] There was ample evidence that E.C. was emotionally unstable and incapable of relating meaningfully to his children and that his condition had showed no improvement during the almost four-year period that the children were in protective custody. *See In re D.R.M.*, 570 A.2d 796, 802 (D.C.1990) (natural mother's failure to demonstrate any improvement in her ability to care for her child during extended period while child was in foster care).

■ Finally, the purported absence of a specific designation for E.C.'s mental condition did not render Dr. Spevak's evaluation insufficient to support the judge's findings and conclusions. *See In re K.J.L., supra,* 434 A.2d at 1006–07. The doctor testified that E.C. suffered from a personality disorder that was likely to have a destructive effect on his children. In Dr. Spevak's view E.C.'s condition was serious and chronic and could result in behavior that was both emotionally and physically dangerous to his children. *In re M.M.M., supra,* does not require, as E.C. suggests, that corroborating expert testimony be presented in order for Dr. Spevak's expert testimony to be competent evidence.

### B.

■ *Adoptability of the children.* E.C. also attacks the sufficiency of the evidence

---

11. His reliance on *District of Columbia v. Barriteau*, 399 A.2d 563 (D.C.1979), and *Edison v. Scott,* 388 A.2d 1239 (D.C.1978), is misplaced. Furthermore, it is somewhat ironic for E.C. to complain about the trial judge's reliance on expert testimony based on an examination that was three years old when E.C. failed to cooperate with efforts of the Department to obtain individual therapy for him at any time after Dr. Spevak's examination, and even failed to appear, except through counsel, at the hearing regarding the termination of his parental rights.

12. E.C.'s reliance on *Daniel Aaron D.,* 49 N.Y.2d 788, 426 N.Y.S.2d 729, 403 N.E.2d 451 (1980), is misplaced. As the court pointed out in *M.M.M., supra,* 485 A.2d at 185, the doctor's testimony in *Daniel Aaron D.* was "equivocal as to [the mother's] ability to care for the child in the foreseeable future, and [he] 'could not render with assurance any positive opinion as to her present condition.'" In neither *M.M.M.* nor the instant case was the court confronted with transitory mental conditions.

to support the trial judge's finding that the children were "very adoptable." In particular, he claims that no adoptive placement had in fact been made or even identified. He concedes, as he must, that certitude of adoption is no longer required. *See In re A.W.*, 569 A.2d 168, 173 (D.C.1990). However, the statute still makes clear that one purpose underlying the termination of parental rights is to increase the opportunities for "prompt adoptive placement," D.C. Code § 16–2351(a)(3). *See In re A.W., supra*, 569 A.2d at 173 (trial judge may, in his or her discretion, inquire about "the practical plans and realistic expectations for adoptive placement of a particular child"), and concern about termination in the absence of efforts to identify potential adoptive parents has been expressed. *Id.* at 174 (Rogers, C.J., dissenting) (in absence of evidence on likelihood of timely adoption, termination of parental rights results in indefinite consignment of children to "the rootless status of children without parents, natural or adoptive"); *Appeal of U.S.W.*, 541 A.2d 625, 627 (D.C.1988) (Rogers, J., concurring) (preferable to have evidence in termination proceeding that the legal barrier was an obstacle to identifying prospective adoptive parents). None of these potential concerns exists in the instant case because the trial judge took care to address them.

In the judge's findings of fact, he referred to the evidence offered by Dr. Petty, the foster parents, and the social worker which indicated that the children were attractive and obedient, and that such problems as they had stemmed from the depri-vation of stability in their lives and were exacerbated by the conduct of the natural parents. The judge noted that the children were young in age and that three adoptive families had expressed interest in adopting a group of siblings like these children, one adoptive family balking at adopting the children only because of fear of the parents' harassing their children's caregivers as well as frustration with delay in the termination proceedings. The active efforts by the Department to identify families interested in adopting the three children are in accord with the general purposes of the termination statute and allay concern that the cutoff of birthright ties will result in endless rootlessness for the children. Furthermore, the judge's findings on the need for termination were amply supported by evidence regarding the nature of the parents' relationship with the children and their conduct toward the foster parents and social worker, all of which, the trial judge could properly find, were posing a substantial deterrent to an adoption.[13] The judge's finding of the need for termination in order to enhance adoption prospects was well-founded in light of evidence of available adoptive families and undermines E.C.'s implied suggestion that he is now, contrary to his conduct over the years, including his failure to appear at the termination hearing, prepared to provide the permanent home and stable environment that the children require.[14] *See also In re K.A.*, 484 A.2d 992, 996 (D.C.1984). Accordingly, the trial judge's finding that the evidence showed "high potential for

---

13. E.C.'s reliance on *In re A.B.E., supra*, 564 A.2d 751, is misplaced. Not only did that case involve complex and rather unique circumstances, but the 12–year–old adolescent child expressed interest in being with the father and the father had made the efforts to obtain therapy for his emotional problems and shown improvement and a desire to continue a relationship with his child. *Id.* at 757. The court further noted that the prospects for adoption of the adolescent child were slim in view of his learning disabilities and emotional problems as a result of child abuse. *Id.* Therefore, the court concluded from all the circumstances that in view of the fact that "this child and parent relationship appear[ed] to retain some value for both [parties,]" termination of the father's parental rights was inappropriate. *Id.* By con-trast, there was no evidence that E.C. had begun therapy or had demonstrated any commitment to providing a stable home environment for the children, nor that the children had bonded with him. Furthermore, in view of the effect of E.C.'s conduct on the children, and his stepdaughter, there was abundant evidence that "substantial good," *id.* at 757, could be achieved by terminating the parents' rights to their three children. Neither in this court nor the trial court did E.C. contend that the special needs of the children made their adoption unlikely.

14. At no point in this court has E.C. actually claimed that he is prepared to offer his children the stable home that they require. Presumably, however, that is the purpose of his appeal.

adoption placement" is amply supported by clear and convincing evidence in the record.

## C.

 *The stepdaughter's testimony.* Finally, E.C. attacks the judge's consideration of the stepdaughter's testimony regarding E.C.'s alleged attempts five years ago to sexually molest her and her mother's conversion of the proceeds of an insurance policy. E.C. claims that the judge abused his discretion since the evidence was irrelevant, indeterminate, and highly prejudicial.

The trial judge found that evidence of E.C.'s violent behavior towards his stepdaughter was relevant to the "personality and character of [the] parents any time after their adult life," noting that the fact that the events in question were distant in time was a matter of weight, and not admissibility. The trial judge likewise viewed the insurance incident to be relevant to the "inference of misuse and expenditures of funds and concern about welfare of the children." Although acknowledging that there was no direct evidence to link E.C. to the insurance incident, his dominance of D.C., the mother, as indicated in testimony by Dr. Petty, the foster mothers, and the social worker, supported an inference, the judge determined, that E.C. was aware of the theft of the money. We find no abuse of discretion. *Cf. In re S.G.*, 581 A.2d 771, 778–80 (D.C.1990) (in neglect proceeding, judge may properly find that abusive conduct toward one child indicates danger to siblings) (citations omitted); *Jones v. Prudential Ins. Co.*, 388 A.2d 476, 481–82 (D.C.1978) (trial judge's ruling on relevance reversible only for abuse of discretion).

Accordingly, the judgment is affirmed.