### In re A.C.,

### Appeal of R.R.

### No. 90–1569.

District of Columbia Court of Appeals.

Argued June 19, 1991.
Decided Oct. 10, 1991.

---

John J. Connelly, appointed by the court, for appellant R.R.

Susan S. McDonald, Asst.Corp. Counsel, John Payton, Corporation Counsel, and Charles L. Reischel, Deputy Corp. Counsel, filed a statement in lieu of brief for appellee District of Columbia.

Melissa L. Cortez, appointed by the court, for appellee, A.C.

Before FARRELL and WAGNER, Associate Judges, and GALLAGHER, Senior Judge.

WAGNER, Associate Judge:

Appellant, R.R., the father of A.C., challenges an order of the trial court terminating his parental rights under the provisions of D.C.Code § 16–2353 (1989). The child's mother, P.C., whose parental rights were terminated in the same proceeding, did not appeal. R.R. argues that his due process rights were violated by the failure of the District of Columbia Department of Human Services (DHS), the social service agency which had court ordered custody of the child, to make reasonable efforts to reunite him with his child and that the trial court erred by failing to apply a presumption in favor of a fit, natural parent. Appellee, the minor child, contends that the trial court's order is supported by clear and convincing evidence and that appellant was not entitled to a parental preference, having failed to grasp his "opportunity interest." Appellee also argues that reunification efforts by DHS are not a required element of proof under applicable law;

nevertheless, DHS made reasonable efforts at reunification, but appellant failed to display any significant interest in the child. We hold that the efforts of a public custodial agency to reunify the family are a relevant factor in the decision-making process in a proceeding to terminate parental rights, but that the agency's defaults in that regard do not preclude termination, if in the child's best interest. Finding no error in the decision to terminate R.R.'s parental rights, we affirm.

## I.

A.C. was born on August 10, 1985. When he was only two months old, A.C.'s natural father, R.R., voluntarily placed him in emergency care with DHS after the child's mother could not be located. The parents were never married to each other. Initially, DHS placed A.C. at St. Ann's Infant Home, and later, in an interim foster care placement. In July 1986, A.C. was placed in foster care with the family with whom he remained continuously until the termination hearing in November 1990. The child has bonded with his foster mother. With the exception of one visit during A.C.'s brief hospitalization in October 1985, R.R. has not visited nor otherwise contacted the child. An order providing R.R. reasonable visitation rights was entered on June 23, 1988. Thereafter, DHS workers attempted to locate R.R. without success. Finally, R.R. requested and arranged for a visit with A.C. in February 1989, but he failed to keep the appointment.

In February 1989, the child's mother, P.C., entered a stipulation in the neglect proceeding acknowledging that she had neglected A.C. by leaving him alone or with unwilling caretakers. She also admitted her inability to care for the child because of

her incarceration and emotional problems, among other reasons. R.R., then a party to the proceeding, did not sign the stipulation; therefore, the trial date for R.R.'s case was reset, along with the dispositional hearing in P.C.'s case for May 9, 1989.[1] DHS workers could not locate R.R. again until he appeared for the hearing. At that time, R.R. informed a social worker that he was unable to care for A.C. because he was unemployed. The trial court entered an order committing A.C. to the custody of DHS. The neglect case was later dismissed as to R.R. at his attorney's request.[2]

On February 23, 1990, the attorney and guardian *ad litem* for the child filed a motion to terminate parental rights. While incarcerated at Lorton, Virginia, R.R. was personally served with a summons and order to appear for the hearing on the motion. R.R. was brought to court from Lorton for the hearing on August 20, 1990, but the case was postponed until November 5, 1990 to secure proper service on A.C.'s mother. In spite of having been personally served and notified of the continued date at the August proceeding, R.R., who had been released from jail by this time, did not appear for the hearing on the motion to terminate parental rights in November. R.R.'s counsel was present at the hearing which resulted in an order terminating R.R.'s parental rights on November 15, 1990. R.R.'s attorney filed a timely notice of appeal on his behalf.

At the hearing on the motion, the family social worker testified that she did not attempt to enter into a case plan[3] with R.R. because he had said that he was unemployed and unable to care for A.C. Further, R.R. had been difficult for DHS to locate. The family social worker contacted

---

1. After an adjudication of neglect under D.C.Code § 16–2316 (1989), a predisposition study is made as required by D.C.Code § 16–2319 (1989) followed by a dispositional hearing consistent with D.C.Code § 16–2320 (1989). *See* Super.Ct.Neg.R. 16, 17 and 18.

2. The motion for an order dismissing R.R. as a party was not filed until June 21, 1990, and the order was entered granting the request on July 13, 1990, *nunc pro tunc* to May 9, 1989. Accord-

ing to R.R.'s motion, an oral motion had been made for dismissal and granted at the May 9, 1989 hearing, but the action had not been recorded.

3. The family social worker explained that a case plan is an agreement between the parent and the agency worker in which services are identified in order for the family to be reunited. The plan specifies the steps the parents must take to reach the goal of reunification.

shelters, hospitals, jails and the morgue in an effort to find him. When R.R. appeared at the neglect hearing, he was given information through which he could contact the agency and maintain contact with the child. R.R. provided DHS with only his mother's address. After R.R. failed to make the scheduled visit he had requested with the child in February 1989, neither the social worker nor R.R. initiated any further contact.

An expert witness on adoptions testified, and the trial judge found as fact, that if parental rights were terminated, A.C. would be readily adoptable because of his tender age and lack of physical, emotional or behavioral problems. As of the date of the termination order, an adoptive family had been approved for A.C., and a backup adoptive family had been identified.

## II.

■ Appellant argues that his due process rights were violated by DHS's failure to make reasonable efforts to reunite him with his son. The argument is unpersuasive. The protections afforded by the Due Process Clause of the Fourteenth Amendment to natural parents to direct the upbringing of their children are well established. *In re A.B.E.*, 564 A.2d 751, 754–55 (D.C.1989) (citations omitted). Such rights are not absolute, and they must yield to the child's best interest in a proceeding to terminate parental rights. *Id.* at 754. In such proceedings, the "parents' constitutional rights are relevant only to the question of what process is due." *Id.*

■ As desirable as it might be, appellant's due process rights do not include as a condition precedent to termination of parental rights that the state agency having custody of a minor child make affirmative efforts to reunite the family. The statute in this jurisdiction which governs proceedings to terminate the parental rights of neglected children, D.C.Code § 16–2351 *et seq.* (1989), contains no express requirement that the agency having custody of a neglected child demonstrate that it has made reasonable efforts to reunite parent and child before the government or a guardian, acting on behalf of the child, can institute termination proceedings nor before the court can decide such cases.

In support of his argument that his due process rights were violated by the failure of DHS to make reasonable efforts to reunite him with his child, appellant relies on cases from states which have statutes requiring proof that the agency having care of the child has made reasonable efforts to strengthen and encourage the family relationship before the petition to terminate can be filed or granted. *See In re Lori D.*, 510 A.2d 421, 424 (R.I.1986) (order dismissing petition reversed where record replete with efforts of state agency to reunite family as required by law);[4] *see also Weaver v. Roanoke Dep't of Human Resources*, 220 Va. 921, 927–29, 265 S.E.2d 692, 696–97 (1980) (termination order reversed because of lack of evidence indicating reasonable efforts taken by social agencies to remedy conditions leading to foster care).[5] In the absence of similar statutes expressly re-

---

**4.** The statute involved requires proof of parental unfitness and includes in pertinent part the following provision, which was interpreted to require reasonable efforts at reunification of the family:

> The court shall ... terminate any and all legal rights of the parent to the child ... if the court finds as fact that:
>
> * * * * * *
>
> (c) The parent has or has had a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) consecutive months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change.

R.I.Gen.Laws § 15–7–7 1956 (1981 Reenactment).

**5.** The section of the Virginia Code under consideration in *Weaver, supra,* requires proof by clear and convincing evidence that termination of parental rights is in the best interest of the child and that:

> 2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health and other rehabilitative agencies to such end.

Va.Code Ann. § 16.1–283(C)(2) (Supp.1979).

quiring that rehabilitative efforts be offered by state agencies, courts have refused to impose such requirements as a condition precedent to filing a termination proceeding. *See In re I.R.A.*, 487 Pa. 563, 410 A.2d 755, 757 (1980). In Maine, in spite of a statutory provision placing upon the state agency an obligation to facilitate reunification of children in its custody with their parents, the court held that the failure of the agency to fulfill that responsibility would not preclude termination of parental rights absent an express requirement of such proof. *In re Daniel C.*, 480 A.2d 766, 770 (Me.1984).

The controlling statute in this jurisdiction contains no requirement that DHS make affirmative efforts to reunite the family. *See* D.C.Code § 16–2351 *et seq.* That is not to suggest that the custodial governmental agency has no obligation in that regard. The statute under which A.C. was adjudicated neglected contains numerous provisions focusing on the roles of the court and public agencies in the reunification process. Following an adjudication of neglect, a predisposition study and report must be prepared which addresses the harms which led to intervention, plans for alleviating them, recommended services and service providers, actions required by the parents to remedy problems, estimated time necessary to reach goals of intervention, and the criteria for determining that continued intervention is no longer necessary. D.C.Code § 16–2319(c)(1). If the child is removed from the care of a parent, guardian or custodian, the report must contain plans for maintaining contact between parent and child and for fostering that relationship, consistent with the child's well-being. D.C.Code § 16–2319(c)(2)(D). The court must consider the plan contained in the report in making its dispositional order. D.C.Code § 16–2320(f); *See In re M.C.S.*, 555 A.2d 463 (D.C.1989); *see also In re C.W.M.*, 407 A.2d 617, 623–24 (D.C.1979). In the disposition order, the court may provide for services by any public agency to the parties deemed necessary, which are within the agency's legal authori-

ty. D.C.Code § 16–2320(a)(5). An agency responsible for providing such services must report to the court and the parties if it is unable to do so. D.C.Code § 16–2320(f).

The goal of prompt reunification of parent with child with assistance from various agencies is also reflected in the limited duration of commitment orders and the subjects addressed at periodic reviews. The term of commitment cannot exceed two years, D.C.Code § 16–2322(a)(1), and it can be extended only for additional periods of one year at a time, if necessary to safeguard the child's welfare. D.C.Code § 16–2322(b). The periodic reviews require reports to the court on the services offered or provided the parent, child and guardian, an evaluation of the cooperation of the parents and guardians with the various agencies, and the frequency of visitation. D.C.Code §§ 16–2323(b)(1)–(4). These provisions reflect the temporary character of such commitments and the expectation that the services of public agencies will be secured to address the needs of the child and family in an effort to assure their reunification.[6]

In spite of the obligations of the public custodial agency contained in the neglect statute or imposed by court order pursuant to it, there is no statutory requirement that such agencies fulfill these responsibilities as a condition precedent to the filing or disposition of a motion to terminate parental rights under D.C.Code § 16–2353 *et seq.* There are clear indications in the termination statute to the contrary. Foremost, the condition is not set forth in the statute which specifies the conditions precedent to filing motions to terminate parental rights. The statute includes only that the adjudication of neglect have occurred at least six months before the filing of the motion and that the child be in the custody of an agency or person other than the parent. It is also significant that before any efforts can be made to provide services to the family to address the problems which may hinder reunification, the court has as a disposition-

6. An agency social worker testified in the proceeding below that the first goal of DHS is to

achieve family reunification.

al alternative following an adjudication of neglect, termination of the parent-child relationship pursuant to the termination statute, if in the child's best interest. D.C.Code § 16–2320(a)(6).[7] Moreover, the overriding consideration is the best interest of the child, which may compel the filing of a motion to terminate parental rights regardless of the defaults of public agencies in seeking reunification of the family.[8]

Defaults by a custodial agency in failing to provide services or make reasonable efforts to assist in resolving problems that prevent the reunification of parents with their children are a serious matter. If the family could remain together without outside intervention, consistent with the child's welfare, there would have been no need for removing the child from the home in the first place. Thus, the agency's failure to make reasonable efforts to foster reunification of parent and child may impede reunifications which might have been possible otherwise with needed assistance and services. Nevertheless, we cannot read into the statute a condition precedent to termination which is not provided for. Moreover, we cannot impose an interpretation which does not adequately consider the child's interest, which is always paramount under the statute. This court has previously rejected the argument that the primary focus in such cases should be directed towards reunification of the parent and child instead of the child's best interest. *In re D.G.*, 583 A.2d 160, 165 (D.C.1990). The extent of reunification efforts is, however, one factor in the decision-making process where the primary focus is the best interest of the child. *Id.*

▪ "The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling." *In re A.B.E., supra,* 564 A.2d at 754 (citing D.C.Code § 16–2353(a)

(1981)); *In re C.O.W.,* 519 A.2d 711, 713–14 (D.C.1987); *In re Adoption of J.S.R.,* 374 A.2d 860, 864 (D.C.1977). It is also required that due consideration be given to the interest of the parents, D.C.Code § 16–2353(a), and among the statute's general purposes is "that the constitutional rights of all parties are recognized and enforced" in the proceedings "while ensuring that the fundamental needs of children are not subjugated to the interests of others ..." D.C.Code § 16–2351(a)(2). In determining the child's best interest, consideration must be given to the well established principle that such interest is presumptively best served when the child can be placed in the care of a parent who is not unfit, *In re S.G.,* 581 A.2d 771, 784 (D.C.1990), including "a fit unwed father who has grasped his opportunity interest" in developing a relationship with the child. *Appeal of H.R.,* 581 A.2d 1141, 1143 (D.C.1990). The action or inaction of the agency having custody of the child is pertinent to the determination of whether a parent has seized that opportunity interest. Among factors considered in determining whether an unwed, non-custodial father is entitled to due process protection is "the impact, if any, of state action on the father's opportunity to establish a relationship with his child." *Id.* at 1162. Where state action interferes with the natural father's assertion of his opportunity interest, such circumstances may preclude a finding that the father abandoned his opportunity interest. *See id.*

The agency's action is relevant to other factors as well. The court must consider the child's need for continuity of care and for timely integration into a permanent home in determining whether parental rights may be terminated, a factor upon which the actions of the public agencies may have impact. *See In re D.G., supra,* 583 A.2d at 165.[9] The child's chance for

---

7. A motion for termination may be filed immediately for a child who has been adjudicated abandoned or when the parent could not be located for the factfinding hearing for three months preceeding the hearing despite reasonable efforts. D.C.Code § 16–2354(b)(1) and (2).

8. A motion to terminate may be filed not only by the government, but by a child through his or her legal guardian. D.C.Code § 16–2354.

9. The statutory factors relevant in this case to determining whether the child's best interest requires termination of parental rights are:

realizing a permanent home may be improved significantly, not by terminating parental rights in hopes of an adoptive placement, but by meaningful intervention of the social service agency in the lives of the existing family. Evidence that the agency failed to make prior efforts in that regard may explain the parent's prior inability to meet the child's needs, and leave open the prospect that the child's integration into a permanent home might be better achieved by increased services, rather than by termination of parental rights. *See In re A.B.E., supra,* 564 A.2d at 755; *see also In re D.R.M.,* 570 A.2d 796, 808 (D.C.1990) (noting agency's efforts to achieve reunification). Therefore, we hold that the effort of the public custodial agency to reintegrate the family is a relevant factor in the decision-making process in a proceeding to terminate parental rights. We also hold that termination of parental rights is not precluded solely because the custodial agency has failed in its responsibility to make efforts to reunify the family. Recognizing these principles, we turn to a review of the trial court's decision under the applicable standard of review.

### III.

■ Our scope of review of the trial court's order terminating parental rights of a non-custodial parent is limited to whether the decision is supported by clear and convincing evidence in the record. *Appeal of U.S.W.,* 541 A.2d 625, 627 (D.C.1988). To affirm the trial court's decision, this court must be satisfied that there is sufficient evidence "such that the possibility of an erroneous judgment does not lie in equipoise between the two sides." *In re K.A.,* 484 A.2d 992, 996 (D.C.1984). The evidence need not be so compelling as to exclude the

likelihood of an erroneous decision, *id.,* but it must be such "that the likelihood of an erroneous decision would be greater if the trial court elected not to terminate parental rights." *In re A.B.E., supra,* 564 A.2d at 755 (citing *In re K.A., supra,* 484 A.2d at 996). The trial court's determination of where the best interest of the child lies may be reversed only for an abuse of discretion. *Appeal of S.M.,* 589 A.2d 1252, 1257 (D.C.1991). We review appellant's case against these standards.

### IV.

■ The trial court's careful findings of fact and conclusions of law which resulted in the order terminating R.R.'s parental rights are unassailable. The court applied to its detailed findings of fact the criteria established in D.C.Code §§ 16–2353(b)(1)–(4) (1989), which must be considered in proceedings to terminate parental rights.[10] The court's findings and conclusions in this regard are well summarized in the following excerpt from its opinion:

A.C. was removed from the care and custody of the natural parents, by voluntary placement in emergency care by the putative birth father, R.R., when he was approximately two (2) months old. A.C. who is now five (5) years old, has had no contact through visitation or contributions to his support and maintenance, with his mother or father since that time. A.C. has resided in the same foster care family since 1986, has bonded with that family and is a healthy and normal child. A.C., having been removed from his biological parents at such a tender age, clearly has no emotional ties or links to his natural parents. Indeed the only mother that A.C. knows is his foster care mother, and A.C. will remain in that

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent; and
(4) to the extent feasible, the child's opinion of his or her own interest in the matter.
D.C.Code § 16–2353(b).

**10.** See footnote 9, *supra.*

home until he is successfully integrated into an adoptive home. An adoptive family has been identified for A.C. It is clearly in his best interest that he be placed in a permanent home. Removal of the only impediment which makes his adoption an "at risk" adoption to an adoption involving a legally-free child will undoubtedly facilitate his adoption and integration into a permanent home.

The trial court also concluded that for virtually all of his tender years, A.C.'s emotional needs had been met successfully by foster parents as a result of which he is healthy and well-adjusted. On the other hand, R.R., who did not even attend the hearings, had no interaction with the child for at least four years. On this record, the trial court's conclusions that A.C.'s best interest requires termination of parental rights to assure his timely integration into a permanent home and his continued physical, mental and emotional well-being is supported by clear and convincing evidence.[11]

Having outlined and considered the factors identified in *Appeal of H.R., supra,* 581 A.2d at 1162, for consideration in determining whether an unwed non-custodial father's opportunity interest will be entitled to substantial due process protections,[12] the trial court concluded that R.R. had never seized "the full panoply of interactions, characteristics and attendant responsibilities which define the parent and child relationship." Clear and convincing evidence supports this conclusion. There is no evidence that DHS or any other governmental agency impeded that opportunity. The record reflects and the trial court found, that DHS made exceptional efforts to attempt to locate R.R., who was well aware of how to contact the agency. Not only did he fail to do so, but he missed the only visit he ever scheduled and even failed to participate personally in the termination proceedings. The presumption that a child's best interest is served by being with a parent, extends only to " 'a fit unwed father who has grasped his opportunity interest.' " *Appeal of A.H.,* 590 A.2d 123, 132 (D.C.1991) (citing *Appeal of H.R., supra,* 581 A.2d at 1143). Without that presumption the record is more than adequate to support the trial court's order terminating R.R.'s parental rights by clear and convincing evidence. Even if the presumption applied, the decision would be the same on this record.

For the foregoing reasons, the decision of the trial court terminating R.R.'s parental rights is

*Affirmed.*

---

**11.** The trial court did not ascertain A.C.'s opinion as to his best interest because the child does not know his parents. The statute requires consideration of this factor only to the extent feasible. D.C.Code § 16–2353(b)(4).

**12.** The factors set forth in *Appeal of H.R., supra,* are:

(1) the presence or absence of an established relationship between the child and an existing family; (2) whether the father has established a custodial, personal, or financial relationship with his child, or assumed responsibilities during the mother's pregnancy; (3) the impact, if any, of state action on the father's opportunity to establish a relationship with his child; (4) the age of the child when the action to terminate parental rights is initiated; and (5) the natural father's invocation or disregard of statutory safeguards designed to protect his opportunity interest. *Id.* at 1162.