Appeal of A.H., et al., Appellants.

(In the Matter of Baby Girl R.L.).

Nos. 90–158, 90–641.

District of Columbia Court of Appeals.

Argued March 13, 1991.
Decided April 23, 1991.

John J. Connelly, appointed by this court, with whom Harvey M. Schweitzer was on the brief, Washington, D.C., for appellant A.H.

Robert E. Sylvester, appointed by this court, Washington, D.C., for appellant S.L.

Susan S. McDonald, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, Washington, D.C., for appellee District of Columbia.

Before FERREN, STEADMAN, and FARRELL, Associate Judges.

FERREN, Associate Judge:

On January 25, 1990, the trial court, on its own motion and over the natural parents' objection, extended a neglected child's commitment to the care and custody of the Department of Human Services (DHS) until March 30, 1990. The court did so because the child's existing commitment order was to expire on January 28 and the Corporation Counsel had not yet filed the required motion to extend her commitment.[1]   On

---

1.  D.C.Code § 16–2322(b) (1989) permits a judge of the Family Division to extend DHS's custody of a neglected child for one year upon motion of DHS:

>   (b) A dispositional order vesting legal custody of a child in an agency or institution may be extended for additional periods of one year, upon motion of the department, agency, or institution to which the child was committed, if, after notice and hearing, the Division finds that—

April 3, 1990, thirteen days before the next review hearing was scheduled, but four days after the January 25 commitment order expired, the Corporation Counsel filed the required motion. After the next review hearing on April 16, and again over the natural parents' objection, the court entered another order extending the child's commitment for an additional year *nunc pro tunc* from January 28, 1990, the original expiration date, to January 28, 1991.

Appellants, the natural parents, contend the trial court lost jurisdiction over the child either when the Corporation Counsel failed to file the required motion to extend commitment by the original expiration date, January 28 (even though the court had acted *sua sponte* on January 25 to extend the commitment), or when the Corporation Counsel failed to file the motion before the interim custody order expired on March 30. The natural father also claims a violation of due process because he was not given notice of the initial neglect proceeding (to which he had not been a party) and because the court treated him in the January and April 1990 hearings as a neglectful parent by denying him visitation rights. Concluding there has been no loss of jurisdiction and no deprivation of due process, we affirm.

## I.

When baby girl R.L. was seven months old, her mother, S.L., then living in a homeless shelter in the District, could no longer care for her and placed her in the emergency care of DHS. Six months later, in October 1986, DHS filed a petition in court alleging R.L. was a neglected child and indicating paternity was "not established." The court issued orders placing the child in shelter care and appointing counsel for her. By December 15, 1986, DHS reports showed the names of two men who could have been the child's natural father. Neither, however, had been given formal notice of the neglect proceeding. On January 28, 1987, in accordance with a stipulation signed by the mother, the court found R.L. to be a neglected child within the meaning of D.C.Code § 16–2301(9)(B),[2] committed her to the care and custody of DHS for a period not to exceed two years,[3] barred the child's release to her parents, guardians, or custodian except by court order, and granted the mother reasonable visitation rights.

The court held status review hearings in July and October 1987 and in April and September 1988.[4] During that period the child remained with one foster caretaker and "strongly bonded to foster family members." The child's attorney and her social worker attended all the hearings, and her mother's attorney attended all but one of them. After each review, the court issued orders continuing the commitment "pursuant to prior orders." On February 21, 1989—three weeks after the commitment order had expired—the Corporation Counsel filed a motion to extend the child's commitment. After a status hearing on

(1) in the case of a neglected child, the extension is necessary to safeguard his [or her] welfare; ...

**2.** D.C.Code § 16–2301(9)(B) (1989) provides:

(9) The term "neglected child" means a child:
(B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian[.]

**3.** D.C.Code § 16–2322 (1989) places limits on the duration of dispositional orders:

(a)(1) A dispositional order vesting legal custody of a child in a department, agency, or institution shall remain in force for an indeterminate period not exceeding two years.

Unless the order specifies that release is permitted only by order of the Division, the department, agency, or institution may release the child at any time that it appears the purpose of the dispositional order has been achieved.

Section 16–2322(b) permits the court to extend a dispositional order for additional periods of up to one year. See *supra* note 1.

**4.** D.C.Code § 16–2323 (1989) requires the court periodically to review its dispositional orders:

(a) When a child has been adjudicated neglected and a dispositional order has been entered by the [Family] Division, the Division shall hold a review hearing.
(1) at least every six (6) months for a child under the age of six (6) years who is committed to the custody of an agency, department, or institution[.]

February 23 attended by attorneys for the child and for her mother, the court extended the commitment *nunc pro tunc* from January 28, 1989 to January 28, 1990.

During the child's initial two-year commitment from January 1987 to January 1989, her mother made only sporadic contact with her; the last visit was in December 1987. In fact, for much of 1988, the child's attorney did not know how to reach the mother and had to obtain the court's permission to notify the mother of the proceedings by posting notice in the Family Division Clerk's office. By February 8, 1989, the child's attorney (who was also her guardian *ad litem*) moved to terminate the mother's parental rights.

In July 1989, for reasons not clear of record, the court appointed counsel for the two putative fathers DHS had learned about in December 1986. By September 1989 one putative father relinquished his parental rights to R.L. But the attorney for the second putative father, A.H., filed an appearance in the termination of parental rights proceeding, claimed paternity, listed the current address for the child's mother, and agreed to submit to blood tests. The tests confirmed to a 99.03% certainty that A.H. was the child's biological father. On December 8, 1989, the court made A.H. a party to the neglect proceeding. A.H. then filed a petition for writ of habeas corpus asking for release of the child to his custody. The petition was denied.

The court held additional review hearings in June, October, and December 1989. On each occasion attorneys for the child and her mother, as well as the child's social worker, were present, and the court continued the current placement "pursuant to prior orders." At the October 1989 hearing, however, the court, upon learning of the mother's renewed interest in visiting R.L., ordered comprehensive psychological evaluations of the mother and of the child by an independent psychologist, in order to assist the court in determining whether visitation by the mother would be harmful to the child. Visitation was limited to the contacts required by this evaluation process. At the December 1989 review hearing, with the father now a party to the proceeding, the court ordered the father to undergo the same psychological evaluation it had previously ordered for the mother. In connection with that evaluation, the court permitted a carefully supervised visit between the child and her father. The results were to be available in time for the January 1990 review hearing.

Meanwhile, in April 1989, the child had been placed with preadoptive parents, the Rs, and on January 16, 1990, they filed a petition for adoption. Over objections by the natural parents, the trial court conferred party status on the preadoptive parents at the January 1990 hearing in the neglect proceeding. By January 1990, therefore, when the child was four years old, she was involved in three separate proceedings: neglect, termination of parental rights, and adoption.

On January 25, 1990, the trial court held a hearing in the neglect proceeding on the natural parents' requests for visitation—requests which the child's counsel and the court-appointed psychologist strongly opposed because of the child's traumatic reaction to the December court-ordered visit with her father. In an effort to be fair, the court deferred ruling on visitation until the natural parents had had time to submit their own psychological reports. The court accordingly granted the expert for the natural parents permission to interview the child. Acting *sua sponte*, the court also entered an order—over the parents' objection—extending the child's commitment to DHS until March 30, 1990 because the commitment order was to expire on January 28 and the Corporation Counsel had not filed a motion to extend. See *supra* note 1. A DHS social worker had been present at the hearing on January 25 and had made an oral motion to extend R.L.'s commitment. The court, however, had refused to consider the motion, noting that an Assistant Corporation Counsel had told the court at the December hearing that the office would file the motion on time. The court's frustration with the Corporation Counsel's failure to file the motion was obvious, for the court replied that "[a]s far as I'm con-

cerned, if I have no motion on March 30th, my authority dies."

The March 30, 1990 status hearing, at which the court intended to evaluate the father's fitness for visitation and possible custody of the child, was continued by agreement of the parties until April 16, 1990 after a key witness, the court-appointed psychologist, had become unavailable. The court did not, at that time, issue a corresponding order extending the child's commitment beyond the March 30 expiration date. By March 30, the Corporation Counsel still had not filed the required motion, even though the child's attorney/guardian *ad litem* had reminded that office of the impending deadline. The next business day, April 2, counsel for the father filed a motion requesting release of the child to the father's care on the ground that the court had lost jurisdiction over the child. The father also called the DHS social worker and requested that the child be readied for release to him because the commitment order had expired on March 30.

On April 3, 1990 the Corporation Counsel filed a motion requesting the court to issue an order extending R.L.'s commitment *nunc pro tunc* from March 30 to the date of the next hearing, April 16. On April 4, the court issued an order granting the Corporation Counsel's motion finding that extension of the commitment was necessary to protect the welfare of the child. The court, however, strongly admonished the office of the Corporation Counsel for "what can only be characterized as an act of gross negligence in not filing the requested motion to extend commitment." Order of Judge Huhn, April 4, 1990 at 3. On April 13, the Corporation Counsel filed a motion to extend the child's commitment until January 1991. After a hearing on April 16, 1990 concerning the jurisdictional issues raised by the father in his April 2 motion, the court issued an order extending the child's commitment *nunc pro tunc* from January 28, 1990 to January 28, 1991. The order explained: "This order is *nunc*

*pro tunc* due to administrative error." The father and mother filed timely appeals from the court's January 25 and April 16 orders. We consolidated these appeals on July 10, 1990.[5]

## II.

Appellants contend the trial court lost subject matter jurisdiction to adjudicate legal custody of the child on either of two occasions: (1) on January 28, 1990, when the Corporation Counsel failed to file the required motion to extend DHS's custody (even though the court had purported to extend custody *sua sponte* on January 25); or, if the court's *sua sponte* order was effective, (2) on March 30, 1990, when the January 25 commitment order expired, no motion had been filed to extend it, the court itself did not act *sua sponte* to do so, and thus no court-approved commitment order was in place. Appellants then argue that, because the trial court lost subject matter jurisdiction over the child either on January 28 or on March 30 as a result of these administrative failures, the court could lawfully continue to adjudicate custody only if the District initiated a new neglect proceeding—which the District did not do. Appellants claim, however, that by March 30, 1990 and thereafter, the trial court lacked personal jurisdiction to entertain a new petition because the child was then domiciled with its preadoptive parents in Maryland and the natural parents were domiciled in Virginia. Thus, appellants urge us to conclude that we should reverse for lack of jurisdiction and leave the matter to the Maryland authorities.

Alternatively, appellants argue that even if the trial court has retained both subject matter and personal jurisdiction over the child, the court abused its discretion by issuing the commitment orders of April 4 and 16, 1990 *nunc pro tunc*, since *nunc pro tunc* orders cannot be used to correct administrative errors. As a consequence, they say, the commitment orders are inval-

---

5. The record also shows that the court held hearings in July and August 1990 to consider the parents' visitation requests in light of the full record of psychological reports. On August

3, 1990, the court permitted supervised visits between father and child every other week at DHS.

id. Apparently, therefore, appellants believe the court could only exercise its jurisdiction by releasing the child to her father, who has not been found unfit.

### A.

■ Subject matter jurisdiction concerns the court's authority to adjudicate the type of controversy presented by the case under consideration. *See* 1 RESTATEMENT (SECOND) OF JUDGMENTS § 11 (1982). We have held that a trial court retains subject matter jurisdiction over a neglected child even though the government delays in filing the required motion for extension of the child's commitment order, *see supra* note 1, until after the existing commitment order has expired and the court has not yet extended the order. *See In re O.A., Y.A. and M.M.,* 548 A.2d 499 (D.C.1988). In *O.A.* we held:

> The trial court, moreover, necessarily retains jurisdiction over the custody of the children as long as the underlying neglect petition has not been finally resolved, either by restoration of physical custody of the children to the parent or by termination of the parent's right in the children altogether. To hold otherwise would leave the untenable possibility that, once an existing commitment was allowed to expire whether through inadvertence or neglect—custody of the children would be left in limbo or, worse yet, would revert automatically to the allegedly neglectful parent without any judicial evaluation of the environment into which the children would be returned.

*Id.* at 500–501. We explained that "[s]ection 16–2322 ... specifies no particular time within which the government's motion for extension of the commitment must be filed. Thus, the motion is not necessarily time-barred merely because filed after expiration of the existing order." *Id.* at 500.

Furthermore, the legislative history of the District's neglect statute reveals that the provisions at issue here—those requiring periodic judicial review and extension of commitment orders, see *supra* notes 1, 3, and 4—were intended "to end the situation in which a child is, after the original disposition, 'lost' insofar as the court is concerned." *Id.* at 501 (quoting *Anti-Crime Proposals: Supplement to Hearings on H.R. 14224 and H.R. 14189 Before Subcomm. No. 3 of the House Comm. on the District of Columbia,* 91st Cong., 2d Sess. 36 (1970) (statement of Donald E. Santarelli, Associate Deputy Attorney General)). If the court's subject matter jurisdiction over a neglected child ended because an executive agency failed to file a timely motion, the essential purpose of the statute—to provide children with the protective net of periodic judicial review—would be undermined by executive failure. We therefore concluded in *O.A.* that "the trial court retained jurisdiction to determine who should have custody of these children notwithstanding that the existing commitment order had been permitted to expire." *Id.* at 501.

■ *O.A.*'s analysis answers both of appellants' contentions here.[6] Because the trial court's jurisdiction over a neglected child does not lapse with the expiration of a commitment order, *see id.,* there is no room for appellant's argument that the court's jurisdiction lapses when the government fails to file a motion to extend and the court acts *sua sponte* to extend the commitment order, as it did on January 25, 1990. Whether or not the court has authority to act *sua sponte* in such a situation—and we believe it does, provided all

---

**6.** Because we hold that the trial court retained subject matter jurisdiction despite the lapse of court-approved commitment orders, we need not reach appellants' argument that, had the district been required to institute a new proceeding, the court would have lacked personal jurisdiction over both the child residing in Maryland and the natural parents domiciled in Virginia. We do note, however, that appellants' reliance on *Stevens v. Brown,* 194 A.2d 126 (D.C.1963) is misplaced. In *Stevens,* we ruled that once the court awarded the "permanent custody" of a District of Columbia child to a Maryland aunt, this court lost jurisdiction over the child. *Id.* at 127, 129. In this case, unlike *Stevens,* the child has not been placed in the permanent legal custody of a Maryland family; rather, the court has placed the child in the temporary legal custody of DHS and permitted the child to remain in the physical custody of a preadoptive family in Maryland, subject to District laws and regulations.

interested parties can be heard without undue delay—it is clear from *O.A.* that the court's jurisdiction over the child continues despite the government's failure to file a motion to extend the commitment pursuant to D.C.Code § 16–2322(b), *supra* note 1.

■ It follows from the foregoing discussion that, just as the court retained jurisdiction after January 28 when the court acted *sua sponte* to extend the commitment order, the court kept its jurisdiction after March 30 when no commitment order was in effect. In *O.A.* a lapse in court-approved commitment orders occurred because the Corporation Counsel had failed to file the required motion to extend custody. The ongoing commitment order expired on July 1, the Corporation Counsel filed the motion on August 6, a hearing was held on August 14, and the court extended O.A.'s commitment *nunc pro tunc* from July 1 for an additional year. *Id.* at 500. We sustained that order. Similarly, in this case, the ongoing commitment order expired January 28, the Corporation Counsel filed the motion on April 13, a hearing was held on April 16, and the court extended the child's commitment *nunc pro tunc* from January 28 for an additional year (having earlier acted *sua sponte* to extend the commitment from January 28 to March 30). In neither case did the court dismiss the neglect petition before the Corporation Counsel filed a motion to extend commitment. Nor did DHS ask, and the court act, to close the case before the filing of the required motion to extend.[7] Without such an affirmative act to resolve the underlying neglect petition, the court retained subject matter (and personal) jurisdiction in *O.A.*—and in this case.

**B.**

Appellants argue, nonetheless, that this case is distinguishable from *O.A.* for two reasons: (1) the trial court's statement that its authority would end on March 30, 1990 if the government persisted in not filing the required motion; and (2) the natural parents' objections to the court's acting *sua sponte* to extend the commitment order from January 28 to March 30, 1990, and granting the government's late-filed motions to extend the child's commitment *nunc pro tunc*, respectively, from March 30 to April 16, 1990, and from January 28, 1990 to January 28, 1991.

**(1)**

■ A court by its own words cannot create or extinguish its own subject matter jurisdiction. Rather, the source of jurisdiction is "the constitutional and statutory provisions by which it is created." *Demar v. Open Space & Conservation Comm'n*, 211 Conn. 416, 423–27, 559 A.2d 1103, 1107–08 (1989). D.C.Code § 16–2303 (1989) grants the Family Division broad, ongoing jurisdiction over minor children: "For purposes of this subchapter [D.C.Code §§ 16–2310 to –2338], jurisdiction obtained by the [Family] Division in the case of a child shall be retained by it until the child becomes twenty-one years of age, unless jurisdiction is terminated before that time."[8] The statute does not contemplate that the trial court's jurisdiction over a minor child may end, as a matter of law, merely on its own say-so. In any event, as the judge herself repeatedly noted, her words were not intended to be a statement of law[9]; they

---

7. R.L.'s case could not be dismissed by administrative action of DHS alone because the court's commitment order, issued pursuant to D.C.Code § 16–2322(a)(1), required DHS to obtain the court's permission before releasing the child from the department's custody. See *supra* note 3.

8. In addition, D.C.Code § 11–1101 (1989) provides:

The Family Division of the Superior Court shall be assigned ... exclusive jurisdiction of—

(13) proceedings in which a child, as defined in section 16–2301, is alleged to be delinquent, neglected, or in need of supervision[.]

9. Appellants argue that the court's statement declaring its authority would end on March 30 became the law of the case, which prevented the court from reconsidering its ruling at a later hearing. That is incorrect. The law of the case doctrine only applies when the prior ruling is "sufficiently final" and not "clearly erroneous;" the doctrine does not preclude a court from correcting its own error. *Williams v. Board of Trustees of Mount Jezreel Baptist Church*, 589

were merely an expression of exasperation aimed at dislodging administrative inertia.

### (2)

■ In this case, appellants immediately objected to the trial court's (a) acting *sua sponte* to extend the child's commitment from January 28 to March 30, 1990, and (b) granting the government's motions of April 4 and 16, 1990, to extend expired commitment orders *nunc pro tunc* from the dates of expiration. In *O.A.*, we "perceive[d] no injustice in permitting the court to entertain the government's [late] motion to continue the status quo … [where] … the parent ha[d] not challenged that arrangement." 548 A.2d at 500. But in the first footnote we cautioned: "We need not, and do not, decide how the trial court should treat a motion by the government to extend a commitment where the existing commitment has expired and the parent has, in the interim, raised a timely objection to continued custody of the children by D.H.S." *Id.* at 500–501 n. 1. Appellants accordingly argue that under *O.A.*, even if the trial court ordinarily does not lose jurisdiction over a neglected child upon the expiration of a commitment order, the *O.A.* footnote cancels that analysis when the parents object. Once there is objection to continuing a child's commitment, they say, the court no longer has jurisdiction to extend the expired commitment order, whether upon motion or *sua sponte*.

■ We cannot agree. A parent's objection to an order extending a child's commitment to DHS does not extinguish the court's jurisdiction to consider what is best for that child's welfare. The *O.A.* footnote merely reserved ruling on what the court is required to do when a parent objects to a government motion to continue a child's custody in DHS after a commitment order has expired. We now answer: whether

acting on government motion or *sua sponte*, the court must permit the parent's objection to be fully aired at the § 16–2322(b) hearing and weighed as part of the court's ruling on whether extending the status quo is "necessary to safeguard [the child's] welfare." D.C.Code § 16–2322(b)(1). The trial court here followed this procedure. Nothing in the *O.A.* footnote should be understood to give parents the power to revoke the court's jurisdiction or to constrain the court's authority to act *sua sponte* or upon motion (provided the parents' hearing rights are honored).

■ The natural parent of a child whose commitment order has expired is not without remedy. If the order has expired and the court has not acted on a government motion (or on its own motion) to hold the required hearing and to extend, modify, or terminate the order, the natural parents may file a motion in the trial court, *see* Super.Ct.Neg.R. 21, or, if necessary, a petition for writ of mandamus in this court, *see Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26, 63 S.Ct. 938, 941–42, 87 L.Ed. 1185 (1943) (writ of mandamus proper "to compel [trial court] to exercise its authority when it is its duty to do so"), *quoted in Anderson v. Sorrell*, 481 A.2d 766, 771 (D.C.1984); 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL PRACTICE AND PROCEDURE § 3933 (1977), to compel DHS and the court to act in accordance with the statute.[10]

### C.

Appellants also argue that, even if the trial court has retained jurisdiction over the child, the court abused its discretion by issuing two successive *nunc pro tunc* orders to extend R.L.'s commitment: one on April 4 and another on April 16, 1990.

A.2d 901, 907 (D.C.1991). Accordingly, there is no law of the case when, as here, the trial court disavows its words at the next hearing in light of established caselaw.

**10.** In *Matter of T.L.J.*, 413 A.2d 154, 158 (D.C. 1980), we stated that the "trial court could entertain the Corporation Counsel's motion [to extend commitment] just as it could that of any

department, agency, or institution to which the child was committed." Accordingly, while the office of the Corporation Counsel normally will file the motion to extend the commitment of a neglected child pursuant to D.C.Code § 16–2322(b), *supra* note 1, the agency itself should not be excluded from making the necessary motion.

They contend the court used its *nunc pro tunc* power unlawfully because the court was attempting to remedy the government's delay in filing the required motion, not to correct a mere clerical omission in the record. Appellants point to the court's own words on the April 16 order that "[t]his order is *nunc pro tunc* due to administrative error."

As a general proposition, the function of a *nunc pro tunc* entry is "to make the record speak the truth by recording or correctly evidencing an act done or judgment rendered by the court at a former time and not carried into the record...." 49 C.J.S. *Judgments* § 117 (1947). "It is not the function of an order *nunc pro tunc* to alter the judgment actually rendered. Its purpose is to merely correct the record of the judgment." *Cairns v. Richardson*, 457 F.2d 1145, 1149 (10th Cir.1972). "Nothing can be entered *nunc* unless it actually happened *tunc*." *Council of School Officers v. Vaughn*, 553 A.2d 1222, 1231 (D.C.1989) (citations omitted) (Schwelb, J., concurring in part and dissenting in part.)

In *O.A.*, we considered the appropriateness of the trial court's *nunc pro tunc* order and concluded that the court had not been required to relate its order back to the date the previous order expired because "it had continuing jurisdiction to deal with the issue of custody." *O.A.*, 548 A.2d at 501. We added, however, that even if the court had erred in so doing, "the error, if any, was harmless." *Id.* The order "did no more than ratify the de facto custody arrangement that existed during [the period after the custody order had lapsed]." *Id.* "The trial court simply formalized its approval of the ongoing custody of the child[ ] by D.H.S. by backdating the order to the date on which the existing custody order expired." *Id.* We adopt the same analysis here. Even though a court may not enter an order *nunc pro tunc* to remedy an omission of an executive agency, in this instance the court was not required to enter any order *nunc pro tunc*. The court's orders simply formalized the court's ongoing approval of DHS's continued legal custody of the child. If the court erred in entering these orders *nunc pro tunc*, therefore, the errors were harmless.

## III.

The child's father, appellant A.H., argues that the trial court violated his right to due process when it failed to notify him of the initial neglect proceeding. He says that he believed his child was dead and that formal notice of the proceeding was accordingly necessary. The failure of notice, he says, fundamentally damaged his ability to develop and maintain a parent-child relationship and seriously eroded his position in the neglect proceedings regarding custody and visitation rights and in the upcoming adoption proceeding. A.H. further contends the trial court persisted in violating his right to due process by treating him as a neglectful parent, denying him custody and visitation rights at the January and April 1990 hearings.

Under the District of Columbia Code and the court rules governing neglect proceedings, the parents of an allegedly neglected child are entitled to notice and appointed counsel at "all critical stages of the proceedings," D.C.Code § 16–2304(b)(1), including the hearing to determine the necessity for shelter care, *see* Super.Ct.Neg.R. 5(b) and 6(a), the initial hearing on the neglect petition, *see* Super.Ct.Neg.R. 15, and the factfinding hearing, *see* Super.Ct. Neg.R. 16(a). The rules specifically state that at the commencement of the shelter care and factfinding hearings, the court shall determine whether lawful notice of the hearing was given to the parents and shall enter this determination in the record. *See* Super.Ct.Neg.R. 6(a) and 16(a).[11]

---

11. The District of Columbia Code, court rules, and caselaw do not clearly address what is to happen when more than one man is identified as the possible father. We observe that the UNIFORM PUTATIVE AND UNKNOWN FATHERS ACT § 4, 9B U.L.A. 36–37 (Supp.1991), would require that all known putative fathers be given notice. We noted in *Appeal of H.R.*, 581 A.2d 1141, 1169 (D.C.1990), that "[g]iven the fleeting nature of a noncustodial, unwed father's opportunity interest in gaining custody of his child, his constitutional right to notice of the ... proceeding will be ephemeral unless he is given notice immediately upon the filing of [a] ... petition."

In this case, the father alleges he did not receive notice of the child's initial neglect proceeding; the District, on the other hand, alleges he received actual notice of the proceeding by virtue of his ongoing relationship with the mother. It appears from the record, however, that when the trial court issued the orders which are the subject of this appeal, it had not yet decided the issue. At the January 25, 1990 hearing, the court noted:

> [L]et me be very clear, so that it's understood.... I have not factually arrived at a conclusion concerning the father and his absence from this child's life. I have arrived and have announced for the record my belief about the mother which is that she lied to the Court. I do not believe that she really and truthfully believed that this child was dead. Now, whether or not the father believed it, even cared about it, I don't know. I have not made a decision. But let me say that it's still very much one way or the other ... I'll make that judgment after all the reports are in....

Absent trial court findings, we are not in a position to review the issue. *See Bronson v. Youngblood,* 276 Ala. 14, 16, 158 So.2d 656, 658 (1963) (judge's comments on issue not sufficiently final to merit appellate review). The claimed denial of due process is therefore premature.

The father also argues, however, that the court denied him due process by treating him as if he were a neglectful parent and refusing to grant him custody or even visitation rights. The focus of a neglect proceeding is the child's condition, not the parent's culpability. To determine whether a child is neglected under D.C.Code § 16–2301(9)(B)—which is the underlying inquiry in this case—the court "only needs to find that the [child is] *without* the statutory requirements. The court need not find that the father abused, abandoned or mistreated his [child]." *In re B.C.,* 582 A.2d 1196, 1198 (D.C.1990) (emphasis in original). "Nothing in the statute requires that a finding of neglect must first have been entered against a non-custodial parent before the court may order a disposition [of neglect] over that parent's objection." *In*

re *S.G.,* 581 A.2d 771, 784 (D.C.1990). The trial court in the present case found by clear and convincing evidence that R.L. was a neglected child. This neglect finding, however, did not in any way determine the father's fitness to be a custodial parent.

It is well established that "a child's best interests are presumptively served by being with a parent, provided that the parent is not unfit," *id.* at 785 (citations omitted), and that this parental preference extends to "a fit unwed father who has grasped his opportunity interest." *Appeal of H.R.,* 581 A.2d 1141, 1143 (D.C.1990). In evaluating the proper temporary custody of a neglected child, however, the court must focus on the child's welfare. *See B.C.,* 582 A.2d at 1198; D.C.Code § 16–2322(b)(1), *supra* note 1. In this case, the court's evaluation properly took into account that the father, A.H., had never been R.L.'s custodial parent; his home environment was totally unfamiliar to the child; the child had met her father only once in a supervised visitation without being told that A.H. was her father; and, in any event, A.H.'s fitness had not been evaluated.

The trial court had begun the process of evaluating A.H.'s fitness. The court had made A.H. a party to the proceeding and had appointed experts to evaluate him psychologically and to observe his interaction with the child. The father's expert was allowed to test the child, and, at the time of the hearings at issue on appeal, the court was waiting to hear from the father's experts. As the court said: "I want what is best for R.L. If that means with [the father], he'll get her. If it means with the [pre-adoptive parents], he will not. And it's as simple as that." The court, however, refused in January 1990 to grant the father further visitation rights, finding, after a full hearing at which the father was represented by counsel, that the child had had a traumatic response to her father's first visit in December. There is sufficient evidence of record to support this finding.

In sum, over the course of these proceedings, the trial court has not foreclosed the possibility that the father would obtain cus-

tody of R.L. if the court were to find at some future date that he had grasped his opportunity interest, *see Appeal of H.R.*, 581 A.2d at 1143, and was a fit parent. The father's presumptive right to be a custodial parent, therefore, has been adequately recognized by the court's ordering the necessary expert evaluations. Under the circumstances, we conclude the father, at the time of the hearings under review, had received due process—unless the trial court (or a reviewing court) were to conclude the father had not received the required notice of the neglect proceeding. The trial court has this notice issue under advisement, it is thus not before us, and we imply no opinion of the legal consequences of any failure to give statutory notice on the record here.

*Affirmed.*