673 A.2d 1259 (1996)
In re D.R., Da.R., Appellants.
Nos. 94-FS-1079, 94-FS-1566.
District of Columbia Court of Appeals.
Submitted November 28, 1995.
Decided March 28, 1996.
*1260 Madeleine Tolmach, Washington, DC, was on the brief, for appellant.
Iris McCollum Green, Washington, DC, was on the brief, for appellee.
Before FERREN, TERRY, and FARRELL, Associate Judges.
PER CURIAM:
After reviewing this proceeding to terminate Da.R.'s parental rights with respect to her daughter, D.R., we conclude that the judgment should be affirmed. In particular, we conclude for the reasons set forth in Parts I., II.A., and II.B. of Judge FERREN'S opinion that there was sufficient evidence for the trial court to apply D.C.Code § 16-2353(b)(2) (1989 Repl.) relating to the physical, mental, and emotional health of the parties involved, and that Da.R.'s Fifth Amendment privilege against self-incrimination was not violated. We further conclude, for the reasons expressed in Part II.C.(1) of Judge FERREN'S opinion, that the trial court erred in declining to apply D.C.Code § 16-2353(b)(5) (concerning evidence of continued drug activity in D.R.'s "home environment") simply on the ground that D.R., as a boarder baby, see id. § 16-2353(b)(3)(A) (1995 Supp.), "never went home." On the other hand, as set forth in Judge FARRELL'S opinion, we reject Da.R.'s contention that, under D.C.Code § 16-2353(b)(5), the District of Columbia must satisfy her statutory right to treatment for drug abuse before termination of her parental rights. In accord with Judge FARRELL'S opinion, we conclude  for reasons different from the trial court's analysis  that § 16-2353(b)(5) does not stand in the way of terminating Da.R.'s parental rights on the facts of this case, and that the trial court did *1261 not err in denying Da.R.'s motions for a continuance and for a new trial.
Affirmed.
FERREN, Associate Judge, concurring in part and dissenting in part:
D.R.'s biological mother, Da.R., appeals the trial court's order terminating her parental rights as to D.R. The majority affirms. To the contrary, because the trial court did not address one of the statutory factors that bear on the decision whether to terminate parental rights  in particular, D.C.Code § 16-2353(b)(5) (1989 Repl. & 1995 Supp.) concerning drug-related activity in the child's home environment  I would remand for further proceedings.[1]

I.
D.R. was born prematurely in September 1991, suffering from prenatal cocaine exposure. D.R. lived as a "boarder baby" in the Columbia Hospital for Women during the first nine months of her life. She was discharged from the hospital in June 1992, and went to live with V.S., her foster mother. On February 28, 1994, D.R.'s court-appointed guardian ad litem filed a petition to terminate Da.R.'s parental rights. At the time of the hearing on the petition  June 29 and July 6-7, 1994  D.R. was nearly three years old.
Da.R. visited her daughter no more than twelve times during the three years before the hearing. In the fall of 1993, Da.R., who was abusing cocaine, entered a detoxification program but was discharged on the 26th day of the 28-day program when a counselor discovered a nicotine cigarette in her drawer. Da.R. resumed using cocaine the day she left the program. She also completed a seven day detoxification program at D.C. General Hospital in April 1994. Nonetheless, Da.R. testified that she continued to use cocaine until June 25, 1994, four days before the hearing. Two days before the hearing, Da. R., with the help of a social worker, obtained placement in the Regional Addiction Prevention (RAP) program, which requires one year of inpatient treatment and one year of aftercare.
In a Memorandum Opinion and Order of October 26, 1994, the trial court applied five of the six factors specified in D.C.Code § 16-2353(b) for use in deciding whether to terminate parental rights. First, the court found that D.R. had a great need for continuous, stable, and permanent care and that Da.R. was not presently able to care for D.R. See id. § 16-2353(b)(1). Next, the trial court found that the foster mother, V.S., and her husband[2] "are physically, mentally and emotionally healthy," and that the biological mother, Da.R., "is not physically, mentally or emotionally available to care for [D.R.]." See id. § 16-2353(b)(2). The court then found that D.R. had no relationship with Da.R., and that there was "no realistic, immediate prospect of [Da.R.'s] developing a relationship with the child because [Da.R.] is in drug treatment and is not allowed to visit with the child for the first 90 days of the program." See id. § 16-2353(b)(3). The court further found that D.R. was a boarder baby, as defined in the statute. See id. § 16-2353(b)(3A).[3] Finally, the court found that D.R. was too young to be able to convey her opinion of what her best interests were. See id. § 16-2353(b)(4). Instead, the court found *1262 that D.R.'s positive adjustment into her foster family was an indication of what her opinion regarding her best interests in the matter would be. The trial court declined to consider the sixth statutory factor concerning "evidence of continued drug abuse in the child's home environment." D.C.Code § 16-2353(b)(5). According to the court, "because the child never went home," there could be no finding under this factor. (In later denying Da.R.'s motion for new trial, however, the trial court confirmed that it had considered Da.R.'s "history of drug addiction" when initially deciding to terminate Da.R.'s parental rights.)
The court then found "there is clear and convincing evidence presented that it is in the best interest of D.R. to terminate the rights of her biological mother, Da.R., pursuant to D.C.Code § 16-2359(f)." The court accordingly terminated Da.R.'s parental rights as to D.R. After filing a motion for new trial on November 4, 1994, which the trial court denied, Da.R. noted this appeal.

II.
Da.R. contends the trial court erred in three ways in terminating her parental rights: (1) there was insufficient evidence to allow consideration of D.C.Code § 16-2353(b)(2) concerning the physical, mental and emotional health of D.R.'s foster parent, V.S., and V.S.'s husband (see supra note 2); (2) the court violated Da.R.'s Fifth Amendment privilege against self-incrimination; and (3) the court failed to consider whether there was evidence of continued drug activity in D.R.'s home environment after provision of social services, as required by D.C.Code § 16-2353(b)(5).

A.
The first claim of error has no merit. Sufficient evidence was presented from which the trial court could find that V.S. and her husband were physically, mentally, and emotionally healthy. See D.C.Code § 16-2353(b)(2). V.S. testified that her health, her husband's health, and the health of others in their home was good. She further testified that she was prepared to support D.R. emotionally for the rest of D.R.'s life. This evidence was sufficient to support the trial court's application of § 16-2353(b)(2).

B.
Da.R.'s second contention fares no better. Da.R. maintains that the trial court violated her Fifth Amendment privilege against self-incrimination when it allowed the guardian ad litem to call her as an adverse witness, in order to examine her about her illegal drug use. When the guardian ad litem called Da.R., the following exchange took place:
[Da.R.'s COUNSEL:] Your Honor, I am going to respectfully object. I had no idea that Ms. Green was intending to call my client as a witness.
THE COURT: Your client is always available to be called in a civil case. This not being a criminal case, there wouldn't be a basis on which to grant your objection.
Da.R. then took the stand and testified that she was living at RAP because she had a drug problem she was trying to cure. The guardian ad litem then asked, "What kind of drugs do you use?" Da.R. replied, "Crack cocaine."
Contrary to the trial court's understanding, "the privilege against self-incrimination... can be asserted `in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.'" Devine v. Goodstein, 220 U.S.App.D.C. 207, 210, 680 F.2d 243, 246 (1982) (per curiam) (citation omitted). But "a witness does not have the broader Fifth Amendment right that an accused does to decline even to take the stand." Vaughn v. United States, 364 A.2d 1187, 1189 (D.C.1976); see Harris v. United States, 614 A.2d 1277, 1282 (D.C. 1992); Wilson v. United States, 558 A.2d 1135, 1140 (D.C.1989). "Although a criminal defendant has the absolute right not to testify, a witness may invoke the privilege only as to those specific questions to which the answers would incriminate him [or her]." Wilson, 558 A.2d at 1140; see Harris, 614 A.2d at 1282; Vaughn, 364 A.2d at 1189. The trial court did not err, therefore, when it permitted the guardian ad litem to call Da.R. as a witness.
*1263 More specifically, the trial court did not err in allowing inquiry into Da.R.'s drug use. As we have noted:
The Fifth Amendment "speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate [the witness]. If, therefore, [the witness] desires the protection of the privilege, [the witness] must claim it or [the witness] will not be considered to have been `compelled' within the meaning of the Amendment."
Harris, 614 A.2d at 1282 (quoting United States v. Monia, 317 U.S. 424, 427, 63 S.Ct. 409, 410-411, 87 L.Ed. 376 (1943)). The only objection Da.R.'s counsel made to particular questions about drug use was a hearsay objection to a question about the results of Da.R.'s most recent drug test. That objection  made after Da.R. had answered the question  was sustained. The record, therefore, does not support the contention that Da.R.'s testimony about her drug use was compelled.

C.
We turn now to Da.R.'s principal contention: that the trial court erred in refusing to consider the final statutory factor applicable to termination of parental rights, D.C.Code § 16-2353(b)(5):
evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to section 106(a) of the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977 (D.C.Law 2-22; D.C.Code, sec. 6-2101 et seq.). Evidence of continued drug-activity shall be given great weight.
The trial court concluded that § 16-2353(b)(5) did not apply for one simple reason: "there was no evidence of continued drug abuse in the child's home environment because the child never went home."
The statutory provision at issue suggests three questions: (1) whether the natural mother of a boarder baby who is removed from the hospital directly into foster care is, nonetheless, a part of the "child's home environment" for purposes of applying § 16-2353(b)(5); if so, (2) whether § 16-2353(b)(5) recognizes a statutory right to drug treatment, as part of the District's obligation to help keep the family together, that must be factored into the termination decision; and, if so, (3) whether the District's provision of that treatment is a condition precedent to termination of parental rights, or whether the best interest of the child can justify such termination despite the District's failure to provide the required treatment.

(1)
As to the first question, Da.R. argues that at the time of D.R.'s birth, Da.R. was inherently  in the very nature of things  a member of D.R.'s "home environment"; they were together. According to Da.R., as the child's biological mother she would have continued to be a member of D.R.'s "home environment" if D.R. had been released to her from the hospital; babies typically go home with their mothers. Thus, she says, the fortuity that the neglect petition was filed before she could take her child home should not affect the application of § 16-2353(b)(5).
We readily agree with Da.R. that, although not apparent on the face of the statute, the biological mother of a newborn child is inherently a person in the child's "home environment" even though the hospital has not released the child to live with the mother. The statute and legislative history do not define "home environment" and do not address the particular question presented here. See COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY REPORT ON BILL 8-139, D.C.LAW 8-87, THE "PROTECTION OF CHILDREN FROM EXPOSURE TO DRUG-RELATED ACTIVITY AMENDMENT ACT OF 1989," at 6 (Oct. 18, 1989) (testimony of Jean Bower, Director, Counsel for Child Abuse and Neglect, Superior Court of the District of Columbia, questioning "why the bill does not provide a definition for the term `home environment'"). Nonetheless, an important statutory purpose incorporated into D.C.Code § 16-2353(b)(5)  "to ensure the protection of the child and the preservation, rehabilitation and, when appropriate, reunification of the family," D.C.Code § 6-2107(b) (1995 Supp.)  suggests that when the statute is interpreted in light of common sense, the *1264 biological mother should be viewed, quite naturally, as a member of a newborn's "home environment" until the mother's legal status as parent is terminated, regardless of where the infant initially resides upon leaving the hospital. See Alvarez v. United States, 576 A.2d 713, 715 (D.C.1990) (courts may look to common sense and the policy underlying a statute to aid interpretation); Moore v. United States, 508 A.2d 924, 925 (D.C.1986) (per curiam) (courts are "not obliged to ignore common sense and evident statutory purpose" when construing statutes).
A mother and child are necessarily united at the time of the child's birth, creating  at least initially  a mutual "home environment." That situation may change temporarily for all sorts of reasons, including neglect based on drug abuse that requires foster care as early as when the child leaves the hospital or later, after the child has been with the mother for awhile. Until there has been a definitive termination of parental rights, however, every statutory factor addressed to the termination decision, including § 16-2353(b)(5), implicitly presupposes that the natural mother is part of the child's "home environment" under scrutiny  if only because that mother is never out of the picture.[4] The very purpose of any termination factor is to help determine whether the parent-child environment that began automatically at birth should be allowed to continue. From this perspective, a merely temporary placement, such as immediate foster care of a boarder baby or later foster care of an abused child  care which can be on-again, off-again in either case[5]  should not be accorded the kind of legal status that decisively defines at any particular moment whether a statutory termination factor, in particular § 16-2353(b)(5), should apply.
The trial court's interpretation eliminated § 16-2353(b)(5) from consideration in this case simply because "the child never went home" to the mother from the hospital. But that reasoning logically can apply as well when a child initially goes to the mother's home, however briefly, and then is removed into foster care. In either case, the child will not necessarily be at "home" with the mother when the termination decision is made. The logical extension of the trial court's reasoning, therefore, would limit consideration of drug activity to the "home environment" of the persons with whom the child resides at the time of the termination hearing and decision, typically the foster parents. That interpretation cannot be right, because in almost all instances it would leave biological parents altogether out of the child's "home environment" for purposes of § 16-2353(b)(5).
We believe that the definition of "home environment" under § 16-2353(b)(5) cannot turn on a distinction between mothers who take their babies home from the hospital and those who do not. Rather, we conclude that "home environment" in § 16-2353(b)(5) means, fundamentally, the home base where a biological parent and her child presumptively will reside, subject to temporary dislocations, until that base is severed by a termination of parental rights.
We recognize that, in some cases, considerable time may pass before a petition to terminate parental rights is adjudicated and a natural mother's legal status as parent is finally resolved. Nonetheless, absent clear legislative indication to the contrary, we discern no sound basis for concluding that any particular period of time, short of a decision to terminate parental rights, would be enough time to deem the natural mother no longer a part of the child's "home environment" for purposes of § 16-2353(b)(5), *1265 whether the child is living in the hospital or in foster care.

(2)
From this point on, I speak only for myself. I turn to the second question: whether the 1990 amendments[6] to the termination statute recognize a statutory right to drug treatment that must be factored into the termination decision through § 16-2353(b)(5).
The Council added § 16-2353(b)(5) to the termination statute as part of the "Protection of Children from Exposure to Drug-Related Activity Amendment Act of 1989," D.C.Law 8-87 (December 21, 1989) (the "1990 amendments"). See supra note 6. Section 16-2353(b)(5) refers to Title 6 of the D.C.Code, in particular § 6-2104.1(a)(3),[7] which requires DHS to provide "social services in accordance with § 6-2107(b)" if the investigative report so suggests. In turn, D.C.Code § 6-2107(b) provides:
If there is a supported report, the agency responsible for the social investigation shall, as soon as possible, prepare a plan for each child and family for whom services are required on more than an emergency basis and shall forthwith take such steps to ensure the protection of the child and the preservation, rehabilitation and, when appropriate, reunification of the family as may be necessary to achieve the purposes of this act. Such steps may include, but need not be limited to: ... (5) referring the family to drug treatment services in the event of neglect or abuse that results from drug-related activity. To the maximum extent possible, the resources of the community (public and private) shall be utilized for the provision of services and case management.
D.C.Code § 6-2107(b) (emphasis added). Additionally, D.C.Code § 6-2104.1(c)(1), which also is among the 1990 amendments  in particular, § 106a of the 1977 Act, as amended  is mentioned in § 16-2353(b)(5). Section 6-2104.1(c)(1) provides even more directly for treatment of a neglectful mother for drug abuse:
(c) The social services required by paragraph (a)(3) of this section shall include:
(1) Provision of drug treatment to any member of the child's home environment who is determined to be in need of drug treatment according to Chapter 16 of Title *1266 32; [D.C.Code §§ 32-1601 through -1610 (substance abuse treatment and prevention)].[[8]]
As I read the Title 6 drug treatment provisions acknowledged in § 16-2353(b)(5), the requirements of § 6-2107(b) amount to a best-efforts-to-find-treatment clause, whereas § 6-2104.1(c)(1) directly requires provision of drug treatment (subject to fiscal limitations). See supra note 8. By expressly mentioning § 106a of the "Prevention of Child Abuse and Neglect Act of 1977," as amended, the termination statute itself, in § 16-2353(b)(5), recognizes the statutory requirement of intervention, with referral for drug treatment, when the DHS Child Protective Services Division receives a report "that a child is abused as a result of inadequate care, control, or subsistence due to exposure to drug-related activity in the home environment." D.C.Code § 6-2104.1(a).
Because the termination statute now expressly recognizes the District's statutory obligation to intervene with drug treatment in cases of abused and neglected children, I believe that § 16-2353(b)(5), as correctly interpreted, requires the court to consider, as a factor in the termination analysis, the parent's statutory right to drug treatment under § 6-2104.1(a)(3) (incorporating § 6-2107(b)) and under § 6-2104.1(c)(1)  treatment provisions enacted to help achieve family reunification.[9]

(3)
But is DHS compliance with the statutory right to drug treatment a condition precedent to termination of parental rights? It is clear from the trial court's Memorandum Opinion and Order of October 26, 1994, as well as from the court's November 9, 1994 denial of Da.R.'s motion for new trial, that (in the words of the November 9 denial) Da.R.'s "history of drug addiction was ... one of several factors considered by the court before the determination was made to terminate her parental rights." Accordingly, if Da.R.'s premise is correct  if drug treatment as a matter of right is a condition precedent to proper application of § 16-2353(b)(5)  then the court's reliance on Da.R.'s drug abuse as a factor tending to justify termination, while the court failed to inquire whether § 16-2353(b)(5) requirements had been satisfied, means the court unlawfully terminated Da.R.'s parental rights.
On the other hand, if § 16-2353(b)(5) does not recognize Da.R.'s right to drug treatment as a condition precedent to termination of her parental rights  or if the court's findings *1267 indicate that any statutory right to treatment has been satisfied  the court is not precluded from terminating Da.R.'s parental rights if in her child's best interest.
Before addressing the trial court's findings and conclusions, I look at the legal implications of § 16-2353(b)(5). The guardian ad litem contends that our decision in In re A.C., 597 A.2d 920, 923-24 (D.C.1991), controls this case and strongly supports a conclusion that Da.R.'s statutory right to drug treatment is not a condition precedent to termination of her parental rights. In In re A.C., a father challenged termination of his parental rights (the mother, whose parental rights also had been terminated, did not appeal). The child had been in foster care from two months of age until he was five years old at time of trial. The father alleged that the failure of the Department of Human Services (DHS) to make reasonable efforts to reunite him with his child violated his constitutional right to due process. We held "that the efforts of a public custodial agency to reunify the family are a relevant factor in the decision-making process in a proceeding to terminate parental rights, but that the agency's defaults in that regard do not preclude termination, if in the child's best interest." Id. at 922. In reaching this conclusion, we elaborated:
The statute in this jurisdiction which governs proceedings to terminate the parental rights of neglected children, D.C.Code § 16-2351 et seq. (1989), contains no express requirement that the agency having custody of a neglected child demonstrate that it has made reasonable efforts to reunite parent and child before the government or a guardian, acting on behalf of the child, can institute termination proceedings []or before the court can decide such cases.
* * * * * *
That is not to suggest that the custodial governmental agency has no obligation in that regard. The statute under which A.C. was adjudicated neglected contains numerous provisions focusing on the roles of the court and public agencies in the reunification process.
* * * * * *
In spite of the obligations of the public custodial agency contained in the neglect statute or imposed by court order pursuant to it, there is no statutory requirement that such agencies fulfill these responsibilities as a condition precedent to the filing or disposition of a motion to terminate parental rights under D.C.Code § 16-2353 et seq.

* * * * * *
Defaults by a custodial agency in failing to provide services or make reasonable efforts to assist in resolving problems that prevent the reunification of parents with their children are a serious matter.... Nevertheless, we cannot read into the statute a condition precedent to termination which is not provided for. Moreover, we cannot impose an interpretation which does not adequately consider the child's interest, which is always paramount under the statute.
Id. at 923, 924, 925.
In the present case, the guardian ad litem cites In re A.C. for the proposition that, even if the District may have failed to provide Da.R. with drug treatment as part of a required effort to preserve the family, that failure cannot stand in the way of terminating Da.R.'s parental rights in the child's best interest. Basically, the guardian ad litem contends that, even if Da.R. is in the child's home environment, the termination statute's reference to Title 6 in § 16-2353(b)(5) should be understood to mean that drug treatment has relevance only if the parent has received such treatment. In effect, says the guardian, § 16-2353(b)(5) should be read to require the termination court to consider
evidence that drug related activity continues to exist in a child's home environment after intervention and services, if any, have been provided....
Da.R. responds, initially, that the 1990 amendments to the termination statute effectively preclude application of In re A.C.'s analysis to the facts of this case. Da.R. agrees that, before the amendments went into effect, the failure to provide drug treatment, like any default by a custodial agency *1268 required to provide services in order to help reunify a family, was relevant to the court's termination decision, but that the default was not a factor the termination statute required the court to consider. See In re A.C., 597 A.2d at 922. Now, however, because § 16-2353(b)(5) recognizes the statutory right to treatment for drug abuse as a factor the court expressly must consider in its termination decision, Da.R. contends that the termination statute, as amended, elevates the District's statutory obligation (through DHS) to seek reunification of the family with the help of drug treatment to a status above that of merely a "relevant factor in the decisionmaking process in a proceeding to terminate parental rights." Id. at 922. Da.R. argues that, in adopting § 16-2353(b)(5), the legislature has determined that a failure to provide drug treatment, where needed, would be such a serious default by a custodial agency that the court may not terminate parental rights without factoring in that default.
I believe that Da.R. is half correct. I agree that the 1990 amendments place this case partially outside the scope of our analysis in In re A.C.[10] In that case, the District's statutory obligation to promote family reunification was not a factor the trial court was required to consider in applying the termination statute. See D.C.Code § 16-2353(b) (1989 Repl.). Now, however, under the amended statute, the trial court, in applying § 16-2353(b)(5), at a minimum must consider, and make findings, as to whether DHS has made the kinds of efforts for drug treatment of the mother, in the interest of family reunification, that the 1990 amendments require. The 1990 amendments, therefore, transform DHS compliance with the statutory right to treatment recognized in § 16-2353(b)(5) from a factor the trial court may consider, as was true of the reunification efforts we considered in In re A.C., to a factor the court must consider  just as the court must consider "the child's need for continuity of care and caretakers," the "physical, mental and emotional health of all individuals involved," and the other statutory factors. See D.C.Code § 16-2353(b)(1)-(5). The 1990 amendments accordingly bring the District's obligation to intervene with drug treatment into the same decisional framework as the other five factors listed in § 16-2353(b).
Specifically, this means that when the trial court appraises the evidence of drug-related activity in Da.R.'s home  which, by definition, qualifies as D.R.'s home environment before termination  the court also must consider whether Da.R., under the circumstances, can be said to have received the services the statute requires. I therefore cannot agree with the guardian ad litem that § 16-2353(b)(5)'s recognition of the District's Title 6 drug treatment obligation is limited to making such treatment a factor germane to termination only if the District actually has fulfilled its treatment obligation. The termination statute references a government obligation, not an optional treatment service, and thus § 16-2353(b)(5) requires the court to consider a failure to provide treatment, as well as the provision of treatment.[11]
*1269 It follows that DHS's failure to meet its statutory treatment obligations, when considered along with the other factors listed in § 16-2353(b), theoretically could tip the balance against termination of parental rights. For example, there could be a home environment that would be stable but for drug abuse, indicating that disintegration will occur unless treatment  which may be enough to save the family  is pursued. On the other hand, it also is theoretically possible that even though the court finds DHS has failed to provide required drug treatment, the other factors of § 16-2353(b), impacted by drug abuse, can weigh so strongly in favor of terminating parental rights that the trial judge may properly order termination. For example, a parent's history of drug abuse may have been so pronounced over such a long period of time, and thus so ruinous of family health in terms of other § 16-2353(b) factors, that the court would have a sustainable basis for terminating parental rights despite DHS's failure to offer treatment under Title 6. See In re L.L., 653 A.2d 873, 885 n. 25 (D.C.1995).[12]
In either case  indeed, in any case  the question under § 16-2353(b)(5) is whether, in applying all § 16-2353(b) factors, drug treatment is likely to make enough difference in the family situation that termination of parental rights should be deferred pending an effort to provide such treatment. Obviously, until treatment is attempted, it will be difficult to make that kind of predictive judgment. But that is the judgment I believe the termination statute calls for in giving due consideration both to the parent's right to treatment under Title 6 (that § 16-2353(b)(5) recognizes) and to the child's best interest.
Da.R. does not accept the possibility of termination without treatment, and this is where I part company with her analysis. Nothing in the statute as presently written  and here is the glitch in Da.R.'s reasoning  demonstrates a legislative intent to subordinate the child's best interests to the District's statutory obligation to promote family reunification by treating a child's mother for drug abuse. Although the 1990 amendments shifted trial court consideration of the District's provision of drug treatment from a discretionary to a mandatory factor, nothing in the language or legislative history of those amendments makes the provision of drug treatment a dispositive factor in the decision whether to terminate parental rights.[13] I therefore must conclude that, even under the language of the amended termination statute recognizing the District's obligation to provide drug treatment, the final conclusion of In re A.C. ultimately controls; "the agency's defaults in that regard do not preclude termination, if in the child's best interest." In re A.C., 597 A.2d at 922.
It is true that addicted parents are entitled to drug treatment under §§ 6-2104.1(c)(1) and 6-2107(b), and that the trial court is obliged to consider, under § 16-2353(b)(5), whether (1) any treatment has been offered; (2) if so, what the results have been; and (3) if not, what the prospects are for successful treatment. But neither the parent's entitlement to treatment nor the termination judge's obligation to consider the results of, or prospects for, such treatment can be *1270 enough to make DHS compliance with Title 6 obligations a condition precedent to termination of parental rights. As was the case in In re A.C., I "cannot read into the statute [even as amended] a condition precedent which is not provided for." Id. at 925.
In sum, I want to make clear that the provision of drug treatment, or the failure to provide it, and the results or likely results of such treatment, must be expressly addressed as part of the trial court's decision, in order to assure that the prospects for family unification with the help of a parent's drug treatment get full and fair consideration.[14] I want to be equally clear, however, that the statute does not make DHS's failure to provide drug treatment, in itself, an automatic bar to termination of parental rights.

(4)
I turn to the court's ruling here. In her Memorandum Opinion and Order of October 26, 1994, the judge purported not to apply § 16-2353(b)(5) in the termination decision, but in denying the motion for new trial the judge stated that she had, in fact, considered Da.R.'s "history of drug addiction." The following findings and conclusions on October 26, 1994, make clear the judge's attention to Da.R.'s drug history:
FINDINGS OF FACT
* * * * * *
3. In a stipulation dated June 19, 1994, the mother admitted to both prenatal and postnatal drug abuse that impaired her ability to provide for her child.
* * * * * *
5. D.[R.] remained in a precarious medical condition from the time of her birth until June 1992 when she was nine months old. From birth until nine months the child was placed first on the Neonatal Ward at the hospital, followed by a placement on the High-Risk Ward where she was placed on a heart monitor. Later, she was given a boarder-baby status, however, because of an infection she was returned to the Neonatology Service until she was well again. At that time she was transferred to the Newborn Nursery, again, as a boarder baby.
6. In an effort to plan for the baby's discharge when she became medically ready, the hospital unsuccessfully attempted to contact the mother several times through the maternal grandmother. Finally, in October or November 1991, the Department of Human Services' social worker visited with the mother at her home.
7. According to the social worker, she advised the mother to call the hospital about the baby and to try and contact a detoxification facility for her drug problem. The social worker testified that at the time respondent's mother was, "severely addicted" to cocaine.
8. The mother acknowledged to the social worker that she was willing to participate in drug treatment and was unable at that time to provide for D.[R.] The mother reiterated this at the hearing.
* * * * * *
13. The mother has been in a detox unit for drug treatment unsuccessfully on two different occasions. D[a].R. herself testified that on the first day after she was released from the detox unit, she resumed using drugs. On her second admission, the mother entered a twenty-eight day drug treatment program, but after completing twenty-six days, she was expelled for violating program rules. She had a nicotine cigarette hidden among her belongings. It was not until two days before this hearing that the mother re-entered a one-year in-patient drug treatment program at Rap, Inc.

*1271 14. The mother has been frank and honest about her condition. She admitted to social workers assigned to her case that she was not able to take care of her child when the child was nearly ready for discharge.
* * * * * *
CONCLUSIONS OF LAW
[§ 16-2353(b)(1)]
* * * * * *
The mother has testified that she has not been available to her child because of her addiction to cocaine. She has admitted that even today she is still not capable of providing for her child. The earliest date on which she feels she can predict whether and when she might resume care for D.[R.] was ninety days after the hearing. However, by that time, she will not have completed the drug treatment program in which she is enrolled. The court recognizes that drug treatment relapses are not uncommon. But, because D[a.]R. has twice experienced relapses in the past, her risk of relapse again in the future may be slightly higher than average. In any event, D.[R.]'s mother cannot today offer her child permanent, stable care....
* * * * * *
[§ 16-2353(b)(2)]
* * * * * *
The mother, D[a.]R., is not physically, mentally or emotionally available to care for this child. She is addicted or, at least has been addicted to illegal drugs. Because of her treatment history, the court cannot favorably predict that D[a].R. will remain healthy enough to provide for D.[R.]'s emotional and physical needs, either in the foreseeable or in the long-range future.
* * * * * *
[§ 16-2353(b)(3)]
* * * * * *
The court further concludes that there is no realistic, immediate prospect of the mother developing a relationship with the child because the mother is in drug treatment and is not allowed to visit with the child for the first 90 days of the program.
* * * * * *
Upon consideration of all of the above factors and the decision this court made not to continue the case another three months, six months or a year to await the results of the mother's third attempt at drug treatment, this court finds that there is clear and convincing evidence presented that it is in the best interest of D.R. to terminate the rights of her biological mother, D[a.]R., pursuant to D.C.Code § 16-2359(f).
It appears, therefore, that the judge gave Da.R. a substantial negative rating for drug addiction. Despite referring to prior and present drug treatments, however, the judge did not make an explicit finding under § 16-2353(b)(5) as to whether Da.R. had received, or was receiving, drug treatment that satisfied Title 6 requirements, and whether such treatment would be likely, or unlikely, to make a difference in the termination decision in light of all applicable factors.
It is true the trial court, in applying factors other than § 16-2353(b)(5), evinced skepticism, in light of past treatment failures, that Da.R.'s RAP program would be successful. But given the seriousness of parental rights termination and the statutory right to treatment now recognized in § 16-2353(b)(5) of the termination statute, I believe that express findings about past efforts and present prospects for drug treatment must be included in any termination decision where drug abuse is an issue. I cannot say the court's findings fit precisely enough into the statutory mandate to warrant affirmance. I therefore conclude we should remand the case for necessary findings.
The record shows that Da.R. had at least two unsuccessful experiences with drug treatment before her current participation in the RAP program. The trial court may consider whether those efforts satisfied the right to treatment under Title 6. If Da.R.'s failed drug treatments before her entry into the RAP program satisfied any obligation the District had to afford her treatment, with a view to preserving the parental relationship, *1272 and if the other termination factors so indicate, then it would appear the court can say, realistically, that the parental relationship should not continue unless Da.R.'s participation in the RAP program now indicates otherwise. On the other hand, it is possible that the trial court, in applying § 16-2353(b)(5), may find that the government's efforts for drug treatment on Da.R.'s behalf have been so inconsequential that, when considered together with the other statutory factors, the court cannot justify terminating Da.R.'s parental rights without first affording Da.R. the benefit of additional treatment under the RAP (or some other) program.

* * * * * *
In sum, I conclude:
1. The biological mother of a "boarder baby," as defined in § 16-2353(b)(3A), is a part of that child's "home environment" within the meaning of § 16-2353(b)(5) unless and until her parental rights are terminated; and
2. In considering a petition to terminate the parental rights of such a mother, the trial court must apply  as one relevant factor  § 16-2353(b)(5), including its reference to the requirements of the "Prevention of Child Abuse or Neglect Act of 1977," as amended, D.C.Code §§ 6-2104.1(a), -2104.1(c)(1), and -2107(b). The court accordingly must make explanatory findings as to whether drug treatment has been provided or not, and whether such treatment makes, or is likely to make, a difference in the termination decision.
I would leave it to the trial court, in the first instance, to decide how the 1990 amendments, see supra note 6, bear on the termination petition presented here. I therefore would remand the case for reconsideration of the trial court's termination of Da.R.'s parental rights and for a ruling consistent with this opinion. I believe the trial court could, in its discretion, open the record for the introduction of additional evidence that bears on evaluation of the relevant statutory factors.
FARRELL, Associate Judge, with whom TERRY, Associate Judge, joins:
I concur in parts I and II.A, B, and C(1) of Judge Ferren's opinion but cannot join part II.C(2), (3), or (4) of his opinion or its proposed disposition. My analysis of appellant's argument addressed in those parts is as follows.
Appellant contends that D.C.Code § 16-2353(b)(5) afforded her a statutory right to drug "intervention and services" before her parental rights could be terminated based at all upon her history of drug abuse. Appellant is mistaken. Section 16-2353(b)(5) requires the court to consider, as one of multiple factors in the termination analysis,
evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to section 106(a) of the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977 (D.C.Law 2-22; D.C.Code, sec. 6-2101 et seq.). Evidence of continued drug-activity shall be given great weight.[[1]]
The statute thus requires the judge making a termination decision to do three things. She must consider evidence that drug-related activity continues in the child's home environment,[2] and, if she credits that evidence, she must give the evidence "great weight." But the drug-related activity in question occurs "after intervention and services" have been provided by the Department of Human Services (DHS) in accordance with the cited sections of Title 6, and it is natural to read this as meaning that before the judge shall give the continued drug activity the mandatory great weight, she must consider whether that intervention and those services have been provided. See In re L.L., 653 A.2d 873, 885 n. 25 (D.C.1995) (since there was "no showing in this case that services have been provided," § 16-2353(b)(5) "has no direct application").
*1273 However, it stretches § 16-2353(b)(5) much too far to hold, as appellant would, that it bars the trial court from any consideration of a parent's drug-related activity, past or continuing, unless the required intervention or services have been furnished, or furnished adequately (however that is measured). This would mean, first, that if the judge found that the services had not been adequately provided, then evidence of a history of drug abuse could not be considered at all as relevant, for example, to whether the parent would provide a "stable ... home" for the child (§ 16-2353(b)(1)) or possesses the "physical, mental and emotional health" necessary to be a proper caregiver (§ 16-2353(b)(2)). Moreover, although § 16-2353(b)(5) refers to evidence of "continued drug activity" in the home environment, appellant's argument would prevent consideration of past drug activity, including relapses despite past treatment, as a predictor of whether the parent could maintain a stable and healthy home environment in the future  unless DHS had intervened and provided treatment services reaching back (arguably) to the beginning of the parent's drug problem. All of this is plainly inconsistent with the paramount consideration under § 16-2353 of the best interests of the child. Section 16-2353(a). See In re A.S.C., 671 A.2d 942, 950 n. 13 (D.C.1996) ("Aside from § 16-2353(b)(5), the court is not precluded from considering a parent's history of drug abuse and the possible risk to the child's welfare that it might present in some cases" (citing In re L.L., 653 A.2d at 885 n. 25)). Moreover, it is quite inconsistent with the evident purpose of subsection (b)(5) to strengthen the case for termination  by specifying the lone "great weight" factor in the enumerated list  when evidence of continued drug abuse is at hand. Appellant's argument would read § 16-2353(b)(5) as in the nature of a limitation on the judge's authority to consider evidence of drug abuse, past or continuing, in applying the factors of the termination statute. We reject that interpretation.
In this case, the trial judge did not make the subsection (b)(5) determinations because of her mistaken understanding of the meaning of "home environment," as Judge Ferren explains, ante at 1263-1265. But that does not necessitate a remand, because the judge's consideration of appellant's drug history as relevant to the other statutory factors, combined with the other considerations the judge found important such as appellant's near-total failure to develop a relationship with the child since birth,[3] firmly support the termination decision. Indeed, the judge's findings and conclusions provide little indication that she relied on evidence of present  continued  drug abuse by appellant at all. In her conclusions of law the judge stated, as bearing on appellant's physical, mental and emotional health (§ 16-2353(b)(2)), that "[s]he is addicted or, at least[,] has been addicted to illegal drugs" (emphasis added). Earlier, in discussing whether appellant could provide "continuity of care and caretakers" and fulfill the child's need for "timely integration into a stable and permanent home" (§ 16-2353(b)), the judge stated:
The mother has testified that she has not been available to her child because of her addiction to cocaine. She has admitted that even today she is still not capable of providing for her child. The earliest date on which she feels she can predict whether and when she might resume care for D. was ninety days after the hearing. However, by that time, she will not have completed the drug treatment program in which she is enrolled. The court recognizes that drug treatment relapses are not uncommon. But, because D.L.R. has twice experienced relapses in the past, her risk of relapse again in the future may be slightly higher than average. In any event, D.'s mother cannot today offer her child permanent, stable care. [Emphasis added.]
This is not the language of a finding that the mother continues to engage in drug-related activity, and certainly not a suggestion that the judge found that evidence conclusive *1274 enough to deserve the mandatory "great weight." Rather, as the judge stated, appellant's drug addiction and relapses, whatever her current behavior, were relevant to her ability to provide a stable, permanent home in the future; they made it impossible for the judge to "favorably predict," as she stated a moment later, "that [the mother] will remain healthy enough to provide for [the child's] emotional and physical needs, either in the foreseeable or in the long-range future." The fact that the judge did not decide whether appellant's drug activity "continued" and thus presumptively made her unfit as a parent (under the "great weight" requirement of § 16-2353(b)(5)) did not require the judge to ignore her drug history in considering the other factors relevant to the termination decision.[4]
NOTES
[1] Da.R. also appeals the denial of her motion for a continuance on the day of trial and the denial of her motion for a new trial. If my proposed disposition had been adopted, these issues would have become moot. Because the majority has decided not to remand, I now would hold, in the alternative, that the trial court's denials of these motions were each an abuse of discretion.
[2] V.S. became D.R.'s foster parent on June 1, 1992. V.S. married her husband on September 4, 1993.
[3] D.C.Code § 16-2353(b)(3A) requires the court to consider whether:

the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child.
See Oliver v. United States, 656 A.2d 1159, 1185 n. 2 (D.C.1995) (noting that § 16-2353(b)(3A) addresses the issue of boarder babies); In re L.W., 613 A.2d 350, 361 n. 15 (D.C.1992) (same).
[4] This case does not present the question, and we do not decide, whether a parent who has failed to grasp an "opportunity interest" in developing a relationship with his or her child can contest the decision to terminate parental rights by asserting that the parent was a member of the child's "home environment" entitled to consideration under the statute. See generally Appeal of H.R., 581 A.2d 1141, 1169-1172 (D.C.1990) (per curiam) (opinion of Ferren, J.).
[5] We have said with reference to child commitment orders, such as those for foster care, that the termination statute "reflect[s] the temporary character of such commitments and the expectation that the services of public agencies will be secured to address the needs of the child and family in an effort to secure this reunification." In re A.C., 597 A.2d 920, 924 (D.C.1991) (footnote omitted).
[6] The "Protection of Children from Exposure to Drug-Related Activity Amendment Act of 1989," effective in 1990 (the "1990 amendments"), amended three different statutes relating to the protection of children: (1) the "Act to Provide for the Mandatory Reporting by Physicians and Institutions in the District of Columbia of Certain Physical Abuse of Children," D.C.Code §§ 2-1351 et seq.; (2) the "Prevention of Child Abuse and Neglect Act of 1977," D.C.Code §§ 6-2101 et seq.; and (3) the termination statute, Title 16 of the D.C.Code, specifically § 16-2301(23) and § 16-2353(b).

Sections 3(b) and 4(c) of the "Protection of Children from Exposure to Drug-Related Activity Amendment Act of 1989" are of particular importance to our decision here. Section 3(b) added a new § 106a to the "Prevention of Child Abuse and Neglect Act of 1977" in Title 6 of the D.C.Code, § 6-2104.1(a)-(c), providing for drug treatment to needy members of a child's home environment. Section 4(c) added § 16-2353(b)(5) to the termination statute, incorporating by reference the new § 106a. See infra note 8.
[7] D.C.Code § 16-2353(b)(5) refers to "intervention and services [that] have been provided pursuant to section 106(a) of the `Prevention of Child Abuse and Neglect Act of 1977,' effective September 23, 1977 (D.C.Law 2-22; D.C.Code, sec. 6-2101 et seq.)." However, § 106(a) of the 1977 Act, codified as D.C.Code § 6-2104(a), appears to be irrelevant to the purposes of § 16-2353(b)(5); it provides that the police are primarily responsible for the initial investigation of cases involving allegedly abused children while the Child Protective Services Division of the Department of Human Services is primarily responsible for the initial investigation of cases involving allegedly neglected children, subject to certain limitations. In contrast, the new § 106a of the 1977 Act  enacted in the same legislation that created § 16-2353(b)(5), see supra note 6, and codified as D.C.Code § 6-2104.1(a)-(c)  calls for, among other things, "provision of drug treatment to any member of a child's home environment who is determined to be in need of drug treatment." Although § 16-2353(b)(5) purports to incorporate the originally adopted "section 106(a)," such an interpretation is nonsensical and would produce "absurd results." See Peoples Drug Stores v. District of Columbia, 470 A.2d 751, 754 (D.C.1983) (en banc). On the other hand, interpreting § 16-2353(b)(5) as incorporating "section 106a" of the 1977 Act, as amended, is entirely consistent with legislative history and the balance of the statutory language. I, therefore interpret § 16-2353(b)(5) as incorporating § 106a of the 1977 Act, as amended, codified at D.C.Code § 6-2104.1(a)-(c).
[8] Unlike § 6-2107(b) of the "Prevention of Child Abuse and Neglect Act of 1977," as amended by the "Protection of Children From Exposure to Drug-Related Activity Amendment Act of 1989," eligibility for treatment under § 32-1602 of the "District of Columbia Substance Abuse Treatment and Prevention Act of 1989," D.C.Code § 32-1602 (1993 Repl.), is limited as follows in § 32-1608:

Nothing in this chapter shall be construed to create an entitlement to substance abuse treatment during any fiscal year if no funds remain available to the District government under a District government or federal appropriation that has been enacted for the specific purpose of providing substance abuse treatment services or unless the person has the ability to pay.
[9] The purposes of the subchapter on termination of parental rights initially included: "encourag[ing] stability in the lives of certain children who have been adjudicated neglected ..." and "increas[ing] the opportunities for the prompt adoptive placement of children for whom parental rights have been terminated." D.C.Code § 16-2351(a) (1989 Repl.). The Council altered the focus somewhat in the 1990 amendments to the termination statute, in particular in the new § 16-2353(b)(5), which refers to the new § 106a of the "Prevention of Child Abuse and Neglect Act of 1977," D.C.Code §§ 6-2101 et seq., also adopted in 1990. See supra notes 6 and 7. As the legislative history indicates, the 1977 Act "provides a statutory framework for insuring that such children and, where appropriate, their families receive effective social services  including drug treatment where indicated  aimed at: (1) promoting the physical and social health of the subject child; (2) reestablishing a wholesome family unit, if possible; and (3) in cases where the natural family unit is likely to remain detrimental to the child's best interests, providing a permanent domestic environment for such child as soon as possible." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY REPORT ON BILL 2-48, D.C.LAW 2-22, THE "PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977," at 1 (March 29, 1977) (emphasis added). The Council, therefore, not only reaffirmed the importance of natural family unity when it amended the termination statute in 1990, but also, for the first time, referred to provision of drug treatment in achieving that end.
[10] This case also differs from In re A.C. in that there is no constitutional dimension alleged here. See In re A.C., 597 A.2d at 923.
[11] This mandatory consideration of the District's provision of  or failure to provide  drug treatment as a factor to be considered under § 16-2353(b)(5) when "drug-related activity continues to exist in a child's home environment" reinforces the conclusion in Part II.C.(1) that the mother of a boarder baby is in the child's "home environment," even when that child goes into foster care immediately from the hospital. The trial court's interpretation of § 16-2353(b)(5), rejecting its application to mothers of boarder babies, if sustained, would result in discrimination against such mothers not in keeping with the statutory policy that favors preservation of all families, even when drug treatment is necessary to accomplish that end.

More specifically, if there is an applicable statutory right to drug treatment, then the fortuity of state intervention to remove a newly born child directly from the hospital into foster care, rather than intervention after the child has lived with the mother, is not a principled basis for saying that the first group of mothers shall not have the right to drug treatment considered as part of the termination decision (since their children never came into the mothers' home environments), whereas the second group's right to treatment shall be a factor (since the children had lived with those mothers awhile). The legislature has not expressed a policy disfavoring mothers of boarder babies in this respect. Such a policy, I believe, would have to be clear before such discrimination between classes of mothers could be recognized for purposes of terminating parental rights.
[12] Here, more specifically, is how the analysis works:

1. If there is no evidence of drug activity in the home environment, or if there is evidence that drug activity is undergoing successful treatment, see In re A.S.C., 671 A.2d 942 (D.C.1996), then drug activity has no place in the termination decision;
2. If DHS provided drug treatment but drug activity continues, such evidence cuts in favor of termination with "great weight";
3. If DHS failed to provide drug treatment and drug activity continues, the failure to provide the treatment required by statute moots consideration of drug activity in the termination decision, unless the court expressly finds, in applying the statutory factors, that drug treatment at time of decision is not likely  for specified reasons  to make a meaningful difference in a family situation that otherwise calls for termination of parental rights in the child's best interest.
[13] Section § 106a of the "Prevention of Child Abuse and Neglect Act of 1977," as amended, provides for services to families in addition to drug treatment. See D.C.Code §§ 6-2104.1(c)(3), -2107(b)(1)-(4). The clear concern of § 16-2353(b)(5) at issue here, however, is the provision of drug treatment, and I limit this opinion accordingly.
[14] The 1990 amendments, as I interpret them, serve to broaden the scope of a hearing to terminate parental rights. In this case, for example, the trial court cut off inquiry into the nature and the extent of Da.R.'s drug treatment at RAP as being irrelevant, stating, "Don't miss the point. This is about baby; not about mom.... I have got a three year old to make decisions about; not a grown woman to whom I wish the best of luck. It's not about her. It had better be about baby." Inquiry into Da.R.'s drug treatment, however  or lack of it  is essential to establishing a factual foundation for the trial court's required findings under § 16-2353(b)(5).
[1] Judge Ferren is correct, ante at 1269 n. 7, that § 16-2353(b)(5) cannot logically be read as referring to section 106a as originally adopted; it must mean "106a of the 1977 Act, as amended, codified at D.C.Code § 6-2104.1(a)-(c)."
[2] I agree with Judge Ferren's understanding of "home environment" in part II.C(1) of his opinion.
[3] The judge pointed out that "[a]t time of the hearing, D.C.R. had visited her baby a maximum of twelve (12) times in about three years," and that it could not "be concluded that after only twelve visits, the child would even recognize her mother."
[4] The trial judge did not abuse her discretion in denying appellant's motions for a continuance and for a new trial.